THE BASTIAN-BLESSING COMPANY *v.* STROOPE.

4-6492                                                   155 S. W. 2d 892

Opinion delivered November 24, 1941.

*L. W. Bower,* for appellant.
*L. B. Smead,* for appellee.

HOLT, J.   On June 2, 1939, Joe Davis sold to appellee, C. S. Stroope of Camden, Arkansas, certain soda foun-

tain equipment for freezing and preserving ice cream, taking therefor Stroope's note in the amount of $1,298 and a "conditional sale contract" from Stroope in which title was retained in Davis until the payment of the note in full. On the same date (June 2, 1939), Joe Davis assigned the note and contract to appellant, The Bastian-Blessing Company.

Shortly thereafter the fountain equipment and accessories were shipped to Stroope and installed by Davis in Stroope's place of business in Camden, Arkansas.

Stroope refused to make payments on the note and on December 30, 1939, appellant brought this suit against appellee, Stroope, to recover the balance ($1,261 with interest) due on the note and sale contract. It alleged in its complaint "That the said Joe Davis, for a valuable consideration, on June 2, 1939, sold and assigned said note and contract to the plaintiff, The Bastian-Blessing Company, who is the owner in due course and before maturity of the same."

Appellee, after admitting the execution of the note and sale contract, the delivery and installation of the equipment in his place of business at Camden, denied every other material allegation in the complaint, and alleged "that said Joe Davis was the agent of plaintiff and acting for it in making said contract and represented and told the defendant that said fountain, counter, carbonator and compressor was what he wanted and that said property would keep and hold ice cream in such condition as to make it sell and be marketable; that said property was in Chicago when the defendant contracted with said Joe Davis, and defendant had no chance or opportunity to try or test said property at the time of making said contract, and relied altogether on the statements and representation of said Joe Davis; that the said contract is fraudulent and void," and further that the equipment would not perform the service for which it was sold to him, was defective, waived all claims to the property, offered to return same to appellant, and filed "counterclaim" alleging damages in the amount of $500.

There was a jury trial and a verdict for the defendant Stroope, appellee here. From the judgment on this verdict comes this appeal.

For reversal appellant urges here "(1) that it was an innocent purchaser of the note and conditional sale contract; and that there was no express warranty on its part and no breach of implied warranty was shown."

1.

The testimony shows that Joe Davis was appellant's agent in its Arkansas territory. The note and sale contract for the equipment in question executed between Davis and Stroope were both on forms furnished Davis by appellant and on the same day they were executed (June 2, 1939) Davis assigned them to appellant. Davis' commission on the sale was immediately forwarded to him by appellant. The property sold was manufactured by appellant in Chicago and sold through its agent in this territory to appellee, and appellee had no opportunity to examine it.

We quote here from the testimony of Joe Davis: "Q. Did I understand you to say, you had an arrangement with the plaintiff that after you sold the equipment you took the order in your own name, and would transfer it to them—they will pay you your commission, and handle the paper. Is that right? A. Yes, sir. Q. And attend to shipping the equipment? A. Yes, sir. Q. They are the manufacturers of the equipment are they? A. Yes sir. Q. Have you done that same way ever since you have been their agent? A. Yes sir. Q. Now, this agreement which was introduced in evidence—the note and contract—they furnish you this form, do they not? A. Yes, sir. . . . Q. At the time you took this paper you expected, of course, to transfer it to the company—the plaintiff? A. Yes, sir. Q. They pay you a commission and they handle the balance, and you have nothing to do with the balance of it, is that right? A. Yes, sir—I don't know whether you would call it a commission or not; I get the difference between what I have to pay for the equipment under the contract, and what I sell it for. . . . Q. This note and contract show to have been prepared and signed at the same time—both of them? A. Yes, sir. Q. By Mr. Stroope? A. Yes, sir."

We think it clear from this testimony that appellant was not an innocent purchaser of the note and sale contract for value before maturity.

The case of *Commercial Credit Company* v. *Childs,* 199 Ark. 1073, 137 S. W. 2d 260, 128 A. L. R. 726, is in point and applies here. There this court said: "We think appellant was so closely connected with the entire transaction or with the deal that it cannot be heard to say that it, in good faith, was an innocent purchaser of the instrument for value before maturity. It financed the deal, prepared the instrument, and on the day it was executed took an assignment of it from the Arkansas Motors, Inc. . . . This court will not disturb, on appeal, the finding of a jury that one is not an innocent purchaser of a note, if the finding is justified or warranted by any substantial evidence. *Holland Banking Co.* v. *Booth,* 121 Ark. 171, 180 S. W. 978; *Iowa City State Bank* v. *Biggadike,* 131 Ark. 514, 199 S. W. 539."

## II.

Appellant next contends that there was no express warranty and no breach of an implied warranty shown. While it is true that there is no express warranty stated in the contract, there is an implied warranty that the property sold here was reasonably suited for the purpose for which it was sold to appellee. The law is well settled that where a manufacturer undertakes to supply goods which it manufactures for a particular purpose and the vendee, or party to whom it sells, has no opportunity to inspect the goods, there is an implied warranty on the part of the manufacturer that he will furnish a merchantable article reasonably fitted for the purpose intended and for which it was sold.

In the case of *Dyke* v. *Magdalena,* 171 Ark. 225, 283 S. W. 374, it is said: " 'Proof of an express warranty by the defendant of the quality of this machinery was not essential to a recovery. Ordinarily, upon sale of a chattel, the law implies no warranty of quality. But there are exceptions to the rule, as well established as the rule itself. One of these exceptions is where a manufacturer undertakes to supply goods manufactured by himself to

be used for a particular purpose, and the vendee has not had the opportunity to inspect the goods. In that case the vendee necessarily trusts to the judgment and skill of the manufacturer, and it is an implied term in the contract that he shall furnish a merchantable article, reasonably fit for the purpose for which it is intended.' (Citing other cases.)

"In the case of *S. F. Bowser & Co.* v. *Kilgore,* 100 Ark. 17, 139 S. W. 541, this court quoted with approval from the case of *Kellogg Bridge Co.* v. *Hamilton,* 110 U. S. 108, 3 S. Ct. 537, 28 L. Ed. 86, the following statement of the law: 'When therefore the buyer has no oppor-. tunity to inspect the article, or when, from the situation, inspection is impracticable or useless, it is unreasonable to suppose that he bought on his own judgment, or that he did not rely on the judgment of the seller as to latent defects of which the latter, if he used the care, must have been informed during the process of manufacture. If the buyer relied, and under the circumstances had reason to rely on the judgment of the seller of the article, the law implies a warranty that it is reasonably fit for the use for which it was designed, the seller at the time being informed of the purpose to devote it to that use'." *Western Cabinet & Fix. Mfg. Co.* v. *Davis,* 121 Ark. 370, 181 S. W. 273.

After a careful review of the testimony we cannot say, as a matter of law, that there was no substantial evidence to support the jury's finding that appellant had breached this implied warranty. The trial court correctly instructed the jury that since the execution of the note and contract in question was not denied, before they would be warranted in returning a verdict for the appellee (defendant below) they must find by a preponderance of the testimony not only that appellant was not an innocent holder but that the equipment sold to appellee was defective to the extent it was not reasonably suitable for the purpose for which it was sold but also "that the seller of the property would have a reasonable time after notice to make any minor adjustments or repairs necessary to make the equipment perform as it was intended to perform on the request of the purchaser."

The evidence on behalf of appellee is to the effect that the equipment was sold to him for the specific purpose of freezing and preserving ice cream. Appellee buyer had no opportunity to inspect the equipment before purchase, it being in Chicago, the place of manufacture. After the equipment had been installed in appellee's place of business, he complained to appellant that it would not perform and was defective, and requested that these defects be corrected.

We quote from appellee's testimony: "Q. After the property was installed, what did you find to be its condition with reference to doing the work for which you bought it? A. No—well, when it refrigerated it would freeze my cream as hard as a rock, and then again maybe it wouldn't refrigerate at all, it would be just soft. . . . Q. State to the jury, what representation Mr. Davis made to you about the equipment when you bought it? A. He said it would operate and do my work right, and keep my cream in good shape so as I could use it. Q. What did he say about the gas? A. Well, I asked him about the gas and he said a tank of gas is supposed to run from ninety to one hundred and twenty days. Q. You say, the first two weeks you used how many tanks of gas? A. Two tanks of gas. Q. In the first two weeks? A. Yes, sir. . . . Q. Could the property have been operated successfully or profitably like it was? A. Well, if it wouldn't refrigerate, it wouldn't operate properly. Q. The way it operated, could you successfully use it in your business? A. No, sir, it ruined my cream. . . . Q. With reference to the ruining of the ice cream—getting it too hard, or soft, and not freezing it at all, how often did it do that? A. Mighty near every night. Q. Did that cause a loss to you? A. When it wouldn't refrigerate; when the cream melts it is no good. Q. Would the ingredients of your ice cream be lost that went into it? A. You would have to re-freeze it. Q. You could not keep your business up with it, is that right? A. No, sir. . . .

"Q. What notice did you give to Mr. Davis or the company about that? A. Well, I called Mr. Davis and told him it wasn't operating satisfactorily, so I could keep my cream, and things, and wanted it fixed. Q. Did

you tell him about the gas? A. Yes, sir, I told him it was using too much gas. Q. What did he say? A. He says, 'Well—' that is about all that was said. Q. After that, what did you do about rescinding the contract; did you notify the plaintiff about that? A. Well, around the fifteenth day, I wrote the company and told them the equipment wasn't operating satisfactorily; that I could not get any service out of it, and I wanted them to come and get it, I didn't want it. Q. You told them to take the machinery out, that you didn't want it? A. Yes, sir. Q. Did Mr. Davis make any effort, or the company, either, make any effort to correct this trouble, about which you notified them, that you have testified about? A. Well, he came back over there and kind of talked around, but he never said what he would do. . . . Q. Did you endeavor to have it fixed yourself? A. Mr. Vice come up there and worked on it some, and he says, 'You will never have any service.' . . . Q. How long did you attempt to operate this fountain? A. Around thirty days. Q. During that thirty days, did you call Mr. Davis and ask him to send some one up here to do something about that gas, or examine the equipment? A. I called him and told him the machine wasn't working satisfactorily; there was no service to it.''

On this testimony, we are unwilling to say, as a matter of law, that the jury was not warranted in finding that appellant had breached this implied warranty and had refused or failed to correct the defects or imperfections complained of.

On the whole case, finding no error, the judgment is affirmed.