[Civ. No. 2888.  Fourth Dist.  July 16, 1943.]

OCEANVIEW MEMORIAL PARK (a Corporation) et al., Respondents, v. A. CAMINETTI, JR., as Insurance Commissioner etc., et al., Appellants.

Morton L. Barker for Appellants.

Rorick & Cottingham, Monroe & McInnis and C. M. Monroe for Respondents.

GRIFFIN, J.—Plaintiffs and respondents M. N. Smith and Pearl K. Smith, husband and wife, are the owners of the stock of plaintiff and respondent Oceanview Memorial Park, a corporation, (hereinafter referred to as Memorial Park Corporation). This action was brought for declaratory relief in order to determine the validity of a promissory note for $32,500, executed March 5, 1932, and the trust deed securing the same, and to enjoin the foreclosure of the trust deed. It was alleged generally that the consideration for the note failed; that the present holder thereof, defendant and appellant A. Caminetti, Jr., Insurance Commissioner of the State of California, as liquidator of the Old West Life & Annuity Company, a California corporation, (hereinafter called the Annuity Company) was not a holder in due course, and that the defendant W. P. Wood, as trustee, was undertaking to foreclose the trust deed by sale, which he had advertised for the 31st day of October, 1941. The relief prayed for was granted by the trial court and this appeal followed.

In 1932, the Smiths organized the Memorial Park Corporation, to conduct a cemetery and mausoleum business. They acquired certain properties for this purpose and divided it into cemetery lots, and a portion thereof was set aside for the building site of a proposed mausoleum. The corporation was mainly created in order that the owners might enter into a proposed agreement with the National Thrift Corporation of America, (hereinafter called the Thrift Corporation) to finance and build the mausoleum on the site mentioned. For this purpose a promissory note was signed and a trust deed, dated March 5, 1932, was executed by the Memorial Park

Corporation to the Security Title Insurance and Guaranty Corporation, as trustee, and the Thrift Corporation, as beneficiary. By their terms the Memorial Park Corporation agreed to pay $32,500 on or before three years to the beneficiary. Upon the back of the trust deed appears an assignment dated March 7, 1932, two days after its execution, whereby the Thrift Corporation assigned the same to one R. E. Trapp. There also appears an assignment dated March 9, 1932, from Trapp to the Los Angeles Life Insurance Company, (hereinafter referred to as the Life Insurance Company).

At the same time there was also executed a contract dated March 5, 1932, between plaintiff Memorial Park Corporation and the Thrift Corporation. The contract on behalf of the latter corporation was signed by W. O. Harris, vice president, and Leo T. Porter, secretary. Harris at that time was in charge of construction. This agreement recites that the Thrift Corporation agrees to build in a satisfactory and workmanlike manner, free from debt or liens (other than the trust deed referred to) a mausoleum, according to plans and specifications, for a total consideration of $37,000. This amount was to be paid first, by the note and trust deed for $32,500, and second, by a bill of sale for 20 individual crypts in said mausoleum to be selected by the Thrift Corporation, and from the proceeds of the sale of which the Thrift Corporation was to receive the net amount of $4,500, the Memorial Park Corporation retaining the exclusive option either to buy or sell the crypts within a period of one year. The contract then provides: ''We agree to the following allowances in the construction of said mausoleum and will credit the account of the Oceanview Memorial Park, a corporation, with any savings thereon, and will accept payment from said Oceanview Memorial Park for any amount in excess thereof.'' Then follows the listed items and amounts which aggregate $28,096. It further provides: ''We agree to start the construction of said mausoleum as soon as all the papers are in proper form, including the trust indenture hereinabove referred to and to diligently continue the construction thereon and to complete the building within a period of four months from the date thereof.''

After executing the above-mentioned contract, there was some delay before construction started. About the month of April, construction commenced and went along for two or

three months "rather haphazardly." The Thrift Corporation became financially involved and in September, 1932, finally stopped construction and later went into bankruptcy. Some scaffolding and part of the frame work of the mausoleum was up and some concrete had been poured for the foundation. No grading had been done as agreed in the contract. Trash was left about the place. Some of the walls had been completed "up to the parapet line." Part of the building was built from the foundation up to where the roof line should have been. Roof forms were put on but were never poured with concrete. Those forms and the incompleted mausoleum remained in that condition for about ten years. Shortly after cessation of work on the building, about $8,500 in mechanics and materialmen's liens were filed and recorded against the property. Actions were commenced upon most of the liens to foreclose them. Settlement was made by Smith with most of the lien claimants. One lien claim was foreclosed. Smith later purchased the property at the foreclosure sale for $300.

In reference to the history of the transaction respecting the trust deed and note the following facts are found by the court: that the Memorial Park Corporation on March 5, 1932, executed the promissory note to the Thrift Corporation in the sum of $32,500; that at the same time and as a part of the same transaction it executed its trust deed securing the payment thereof to the Security Title Insurance and Guaranty Company; that the sole and only consideration for the promissory note and trust deed was the written contract executed upon the same date and as a part of the same transaction; that the Thrift Corporation thereby undertook and agreed to erect upon the real estate and to complete within four months in accordance with specifications then agreed upon and approved, a mausoleum building; that it was an implied term of said contract that said promissory note should not be placed in the hands of an innocent purchaser for value prior to the completion of said mausoleum building; that there was no substantial performance of said building contract; that the Thrift Corporation thereafter was adjudicated a bankrupt, and said structure was never completed; that on March 7, 1932, the Thrift Corporation assigned to Trapp the promissory note for $32,500; that on March 9, 1932, Trapp transferred the same to the Life Insurance Company; that said Life Insurance Company, by successive changes of name, became known as National Thrift Assurance Corporation of

California (hereinafter called the Assurance Corporation), and Old West Life & Annuity Company, a corporation; that on March 7, 1932, the Thrift Corporation caused an assignment of its interests in the trust deed to be made to the Assurance Corporation; that said trust deed was recorded on March 26, 1932; that neither Trapp nor the Life Insurance Company were innocent holders or holders for value in due course of said note or the beneficial interest in said trust deed securing the same; that, on the contrary, Trapp and the officers of the last-named corporation well knew the terms of the building contract and that at the time of said transfer the same had not been fulfilled; that said transfers were not made in the regular course of business and that the transfer of the last-named corporation was not for a valuable consideration; that although defendants have possession of the note and trust deed, nevertheless it is subject to all defenses to which the same would be subject in the hands of the original payee, the Thrift Corporation; that the attempted transfer of the note constituted fraud upon the rights of the plaintiffs and that the facts relative thereto were fully known to all subsequent holders thereof. The court concluded that the plaintiffs were entitled to have the title to the property quieted as against the trust deed and the defendants above mentioned, and that the plaintiffs are entitled to an order permanently enjoining the foreclosure or enforcement of the trust deed. Judgment was entered accordingly.

Appellants' main contention is that there is not sufficient evidence to sustain the trial court's finding that the defendant Annuity Company or the defendant Insurance Commissioner, as liquidator thereof, did not take the instruments in question as a holder in due course.

Smith testified that he knew nothing as to what happened to the trust deed until notice of the sale thereunder was given him in the fall of 1941 by W. P. Wood, as substitute trustee; that he did not "suppose they could collect the note as they had not performed the contract"; and that under the contract he was not aware that it would be legally possible for the Thrift Corporation to transfer the note to a third party.

Trapp testified and appellants contend that prior to February 24, 1932, the Thrift Corporation was engaged in procuring funds for use in its business by the sale of what were known as thrift certificates; that the certificates were a form of bond; that the corporation was engaged in making loans

of various types and also engaged in the construction and sale of various types of buildings; that he, Trapp, had a contract with the Thrift Corporation on a commission basis which gave him the exclusive agency in the United States covering the sale of the investment certificates issued by the corporation; that these certificates were sold on an installment basis and payments extended over a period of approximately 18 months; that Trapp maintained offices in California and also in other states; that in February, 1932, the Thrift Corporation decided to change its plan of operation and entered into negotiations with Trapp for the cancellation of his contract; that on February 24, 1932, an agreement was entered into by him and the corporation under which he agreed to the termination of his exclusive selling agency and the cancellation of unearned commissions; that at that time it was estimated that the total commissions to which he would be entitled under his contract exceeded the sum of $50,000; that the corporation agreed to pay him $35,000 in securities, consisting of first trust deeds and $15,000 in cash; that at the time of entering into the agreement Trapp had coming to him, as accrued earned commissions, the sum of $19,000; that he received about $5,000 in installments, and the promissory note for $32,500 here involved, secured by the trust deed which is the subject of this action; that the note and deed of trust were acquired by the Thrift Corporation in the following manner: That prior to February 24, 1932, the Life Insurance Company had been engaged in the sale of life insurance and other forms of insurance in the State of California; that the officials of the Thrift Corporation had determined that they could make more money for the corporation by engaging in the sale of a combination of an investment certificate and life insurance policy, and for this purpose the officials acquired control of a corporation which held the stock of the Life Insurance Company; that they planned to discontinue the sale of the thrift certificates formerly sold through Trapp's agency and they so informed him; that he objected to the threatened cancellation of his contract and it was finally agreed that if he would agree to a cancellation and put money into the Insurance Company he would be given a contract for the sale of policies of that company; that pursuant to this agreement Trapp delivered to the Life Insurance Company the sum of $10,000 in cash shortly after February 24, 1932, and agreed to deliver securities of the value of $35,000; that in return,

Trapp was to receive stock of the value of $35,000 in a holding corporation which held all of the stock of the insurance company; that on February 25, 1932, the name of the Los Angeles Life Insurance Company was changed to National Thrift Assurance Corporation; that because of the fact that the insurance company became insolvent no stock in the holding company was ever issued to Trapp under the agreement; that on February 24, 1933, the Insurance Commissioner of the state, pursuant to a petition filed by him for that purpose, was appointed liquidator of the Old West Life & Annuity Company, by order of the court, and in the latter part of 1941, commenced proceedings for the foreclosure of the trust deed in the full amount set forth therein. This action followed.

It will be noted that the endorsement of the note by the payee thereof and by Trapp was effected before the instrument was due. Under section 3140 of the Civil Code, the holder thereof is deemed prima facie to be a holder in due course. A holder in due course is a holder who has taken a negotiable instrument under the following conditions: ". . . 3. That he took it in good faith and for value; 4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it." (Sec. 3133 Civ. Code.) In this connection, in support of the court's findings, we will review some of the additional evidence offered in that respect.

First, it is conceded that the statute of limitations has run as against the promissory note. The trust deed was assigned directly from the original beneficiary to the Life Insurance Company. It is apparent that the Thrift Corporation and its officers had knowledge of the terms of the building contract for which the note and deed of trust were issued, and that no consideration had passed between the maker and the beneficiary at the time the instruments were executed. The contract was drawn by W. O. Harris and a copy of it was on file in the office of the Thrift Corporation with the note. The trust deed was placed of record. Trapp, for several years, maintained an office on the same floor in the same building with the Thrift Corporation. However, he testified that he did not have knowledge of its transactions or occupy any official capacity with that corporation other than operating his own sales agency in selling securities of that corporation. He did testify that a few days before he accepted the note and

trust deed he made a trip to the property; that he did not make any effort to contact the makers of the note or trust deed, but his attorney made an investigation and reported back to him.

Harris, as vice president, testified that he handled the transaction for the Thrift Corporation; that he discussed it with Trapp, and around the time the papers were being completed, Trapp asked him what the details of the deal were, and as he remembered it, he showed him a copy of the building contract.

Plaintiff Smith testified that he discussed "in generalities this contract" with Trapp, which conversation was held shortly before the contract was executed.

Harris further testified that one Bruce Young, affiliated with the Life Insurance Company, was brought to the Thrift Corporation office about that time and that Trapp and Young held a lot of "secret sessions" with Nathan T. Porter and his son Leo T. Porter, president and secretary respectively of the Thrift Corporation; that he, Harris, "knew there was some insurance deal of some kind brewing, but what it was I didn't know"; that as far as he, as vice president of the Thrift Corporation was concerned, he would never "have considered such a proposition as the assignment of the note and deed of trust . . . because it was an incompleted transaction."

The evidence also discloses that in the certificate of change of name, on March 3, 1932, Nathan T. Porter and Leo T. Porter were named as president and secretary of the Life Insurance Company. These individuals were also president and secretary of the Assurance Corporation.

Without setting forth other evidence produced, it already seems to be a logical conclusion to be reached that the parties, finding the Thrift Corporation to be in financial distress and facing bankruptcy, were merely transferring the trust deed and note from one corporation controlled by them to another corporation or corporations also controlled by them, for the purpose of rehabilitating the latter corporations; that Trapp was merely an instrumentality used for this purpose and that they well knew about the entire transaction respecting the Memorial Park, the terms of the building contract, the consideration for the note and deed of trust, that the amount payable by the Memorial Park Corporation was dependent upon contingencies to happen in the future; and that they knew that under the provisions of the building contract

the amount to be finally paid on the note and trust deed might be substantially less than the amount expressed on the face of those instruments.

From the evidence the trial court was fully justified in holding that the appellants were not holders in due course; that there was no consideration or that the consideration had failed, and that the note and trust deed were unenforceable, either in the hands of the original holder or subsequent holders, and each were charged with notice of the conditions surrounding the execution of the trust deed. (*Goodwin* v. *Nickerson*, 51 Cal. 166; *Prouty* v. *Adams*, 141 Cal. 304 [74 P. 845]; *Meyer* v. *Weber*, 133 Cal. 681 [65 P. 1110]; *Spotton* v. *Dyer*, 42 Cal.App. 585 [184 P. 23]; *Roush* v. *Kirkman*, 42 Cal.App. 115 [183 P. 353]; *Symonds* v. *Sherman*, 219 Cal. 249 [26 P.2d 293].)

In this connection it is also argued that under the evidence, as a matter of law, plaintiffs are estopped from denying that they had knowledge of the transfer of the instruments and that the defendant commissioner is a holder in due course. It appears from the evidence that plaintiff Mr. Smith in one of the actions to foreclose one of the liens against Memorial Park Corporation, filed a verified answer in which he set up as a defense thereto that the note and trust deed above mentioned were sold to a third person by the Thrift Corporation and are "still outstanding and unreleased, and said trust deed constitutes a first lien upon said premises"; that before the mausoleum was completed, the Thrift Corporation became insolvent and "the mausoleum still remained 75 per cent uncompleted." Defendants here were not parties to that action. There was no adjudication of those questions in that action. While a verified pleading filed by a party in one action is competent evidence against him in another case as an admission, it is not conclusive and does not carry the effect of an estoppel of record. (*De Bock* v. *De Bock*, 43 Cal.App. 283 [184 P. 890]; 10 Cal.Jur., p. 616, sec. 6.) As between the parties to this action the pleadings above mentioned did not constitute an estoppel as a matter of law for the purposes suggested.

It is next contended that even though appellants were not holders in due course, the trial court failed to require the maker of the note and trust deed to make payment to defendants herein for the benefits received under the building

agreement pursuant to which the note and trust deed were given; that the action was an equitable proceeding and that therefore before plaintiffs could obtain the relief sought, they would have to do or offer to do equity. It is argued that in their answer defendants alleged that a *substantial portion* of the mausoleum was completed by the Thrift Corporation; that they expended over $13,000 in its erection; that a portion of the incomplete building is now being used by plaintiffs, and that they have collected large sums from the sale of crypts therein; that the trial court failed to find on this issue and denied defendants any relief. They cite the rule set forth in 27 Cal.Jur. p. 212, sec. 19, ". . . that while a special contract remains unperformed, the party who has not completed his part cannot sue indebitatus assumpsit to recover compensation for what he has done. But there is an exception to the rule in cases where something has been done under a special contract, though not in strict accordance therewith. While no recovery can be had on the contract, if the other party has derived some benefit from the labor performed the law implies a promise on his part to pay such remuneration as the benefit conferred is really worth."

The trial court did find that "there was no substantial performance of the building contract"; that the trust deed was unenforceable; that the consideration failed, and that plaintiffs were entitled to have their title to the property quieted as against the trust deed and against defendants, and no condition precedent was attached to such right in the findings or judgment.

We must conclude that the court found against defendants on the issue that they were entitled to any relief under their claim. The record fully supports the court's finding that the Thrift Corporation breached its building contract through no fault of plaintiffs. It is true that defendants presented in evidence a record of the Thrift Corporation's cancelled checks and book account purporting to show that certain payments had been made for labor and material by that corporation in reference to the Memorial Park contract. These amounts totalled approximately $12,424.49. Pictures were received in evidence showing the incomplete state of the building.

Defendants produced an engineer as a witness, who testified as to the value of the building in its incomplete state. He testified that he did not see the building until 1942; that he

could only put a value on the work that was there then; that it was testified that the work was about 60 per cent completed; that 60 per cent of $12,000 would be about $7,000 not allowing for the marble work which was done later; that the marble work was worth around $4,000; that his estimate of the value of the building in 1932, including all items, was about $6,000.

Plaintiff Smith testified that most of the work that had been done by the Thrift Corporation was more of a detriment to the Memorial Park than it was an asset; that when work ceased on the building, scaffolding and roof forms were left up, but concrete was not poured; that over a period of ten years the forms became weather beaten, were useless, and had to be removed; that he tried to secure a loan on the property to fix it up but could not, due to the clouded condition of the title involving all of his lots by reason of the trust deed; that later he tried to fix up the lower corridor of the mausoleum; that he built an office and rest room, put on a temporary roof over the corridor, and used the marble delivered on the job in constructing some 99 crypts of those contemplated and disposed of most of them at $175 apiece; that the Thrift Corporation never paid for the marble or items of brass and copper that were used by him; that this was an item of one of the liens which he settled; that he paid off approximately $3,000 in liens by exchange for crypts and graves and by cash; that he "laid out" probably $5,000 in money in title searches and additional expenses and also paid out "several thousand dollars" more in parking and landscaping, which was supposed to have been done under the contract, plus another item of $225, for which he held a receipt. He then testified that in his opinion about 60 per cent of the *concrete work* had been done when the Thrift Corporation went bankrupt (not that 60 per cent of all of the work was completed as believed by defendants' witness, the engineer, and upon which he made his compilation of estimated value); that he, Smith, spent several months of hard work himself in making the buildings and grounds presentable. He then testified upon cross-examination that the Thrift Corporation did put some material and labor into the property and enhanced the value of it about $10,000, but he testified that subtracting the liens, etc., which the Thrift Corporation did not pay, he did not see how it could claim those items as its expenditure of money.

There is no question but that plaintiffs have been greatly

inconvenienced and damaged by the Thrift Corporation's breach of the contract, and by its subsequent actions. It is under this evidence that defendants claim that they were entitled to be reimbursed for the purported amount plaintiffs have been enriched by the transaction. Defendants complain because the court failed to find the amount of claimed enrichment and refused to award them a share thereof. From an examination of the evidence it is readily apparent that the evidence was not only conflicting, but also quite confusing respecting the amount of the claimed equitable relief, if any, that might be rightfully due to defendants. It is true that the Thrift Corporation did expend some sums and furnish some material and labor on the building. Much of the material was not paid for by it, however, and liens were allowed to be filed against plaintiffs' property. They were confronted with many lawsuits in connection therewith. Any beneficial arrangements Smith may have made with those claimants in payment of the material could not and should not be claimed by the Thrift Corporation or its assignees. The Thrift Corporation was the one who breached the contract and apparently by some manipulation endeavored to gain some advantage to them by assigning the note and trust deed. It cannot be said under the evidence that the trial court abused its discretion in failing to award to defendants any relief. The trial court fully considered this question. If counsel are at all in doubt in this respect, a copy of the trial court's opinion accompanying the record should be read. The reasons there expressed and the conclusions reached as to why defendants were not entitled to equitable relief, are stated in quite forceful language. It does not appear therefrom that if the court would find more fully on the subject, such a finding would be in defendants' favor. (*Bell* v. *Adams,* 150 Cal. 772 [90 P. 118].) The trial court's determination of the equities of the respective parties will not be disturbed upon this appeal.

Judgment affirmed.

Barnard, P. J., and Marks, J., concurred.