[Sac. No. 7786. In Bank. Dec. 12, 1968.]

WILLIAM MORGAN et al., Plaintiffs and Appellants, v. REASOR CORPORATION et al., Defendants and Appellants.

David W. Packard for Plaintiffs and Appellants.

Marvel M. Taylor for Defendants and Appellants.

TOBRINER, J.—Plaintiffs, the buyers of a house to be constructed upon their land, obtained a judgment barring the assignees of the sellers of the house from collecting certain carrying charges (the so-called time price differential) because of violations of the Unruh Act (sections 1801 through 1812 of the Civil Code). The judgment also awarded to plaintiffs their attorney's fees and costs as well as certain incidental damages.

Recognizing the salutary purposes of the Unruh Act in requiring that consumers obtain certain specified information as to the terms of instalment contracts, and in protecting against abusive provisions in such contracts, we reject defendants' appellate contentions, which defeat the statute's provisions and objectives. We therefore hold (1) that the Unruh Act applies to the contract for the construction of the residential housing involved in the instant case, (2) that the holder of a note with constructive knowledge of noncompliance with the Unruh Act is "barred from recovery of any time price differential or service charge," (3) that the defendant assignee of that note here had both constructive and actual knowledge of the violations of the Unruh Act, (4) that the Unruh Act provides for reasonable attorney's fees and costs in a suit for a declaratory judgment, and (5) that violations of the Unruh Act cannot be corrected more than 30 days after the execution of the contract involved. The judgment should therefore be affirmed in all respects except for its provision for the defendants' collection of a time price differential accruing after June 2, 1966.

The trial court's findings of fact disclose that on or about October 14, 1962, plaintiffs agreed to purchase from the IBC Corporation (hereinafter "IBC") a house (IBC's "Pixley" model) to be constructed by IBC on a lot owned by plaintiffs. Plaintiffs executed a written document designated a "Lien Contract and Deed of Trust" (hereinafter "contract") by which IBC sold and plaintiff bought the goods and services described by the trial court as "the labor and management necessary to cause said home to be constructed; and goods, to wit: the materials, appliances, fixtures, and other personal property necessary for the construction of said home and dwelling in accordance with said documents." The contract also contained a provision granting the lot and all improvements thereon to the Bay Counties Title & Guarantee Company to be held by Bay Counties as security until plaintiffs completed payment.[1] In addition, plaintiffs executed at the same time in a separate document in favor of IBC a promissory note for $19,398.12, which represented the $11,844 cost of the house, plus a "time price differential" of $7,554.12. Under the note plaintiffs agreed to pay 71 monthly install-

---

[1] The Unruh Act covers not only the sales contract but the security agreement with Bay Counties as well. In defining a retail installment contract, section 1802.6 provides: "When taken or given in connection with a retail installment sale, the term includes but is not limited to *a security agreement . . . .*" (Italics added.)

ments of $116.06 each and a final installment of $11,157.86.

Within three months thereafter, IBC assigned to the Midwest Homes Acceptance Corporation (hereinafter "Midwest") both the contract and the note. Midwest accepted the assignment with full knowledge of all of the "terms and conditions" of the contract and the note, including knowledge that the note and contract arose simultaneously out of the same transaction. On or about March 29, 1963, IBC merged into the Reasor Corporation (hereinafter "Reasor") and Reasor assumed all the "liabilities, debts, obligations, and causes of action which had existed against IBC."[2]

Plaintiffs contend that the contract and note violated the Unruh Act. Although defendants urge that the act does not apply to the construction of residential housing, they admit that if it is applicable, the facts here would constitute a showing of its violation. Contrary to Civil Code section 1803.2,[3] the contract and note were not encompassed in a single document; contrary to Civil Code section 1803.1,[4] the note was not dated at the time it was executed by plaintiffs; and, contrary to Civil Code section 1803.4,[5] the contract contained blank spaces which were later filled in by either IBC or Midwest.

Section 1812.7 of the Civil Code[6] provides that any person failing to comply with provisions of the Unruh Act, and any person acquiring a contract with knowledge of such noncompliance, shall be barred from recovery of any time price differential. Accordingly, plaintiffs sought a declaratory judgment which would hold that they owed no obligation to pay any such time price differential.

The trial court held the Unruh Act applicable to the con-

---

[2]Reasor did not itself violate the act, and does not fall under section 1812.7 as a "holder," since IBC assigned to Midwest the note and contract before it merged into Reasor. (See fn. 6, *infra.*) Reasor's assumption of the "liabilities, debts, obligations and causes of action which had existed against IBC," however, entailed an assumption of IBC's civil liability under section 1812.7, and that assumption is enforceable by plaintiffs as third party beneficiaries against Reasor.

[3]"Except as provided in Sections 1803.9 [cash sale under $50] and 1803.3 [memorandum of subsequent purchase in add-on sales], every retail installment contract shall be contained in a single document . . . ."

[4]"A retail installment contract shall be dated . . . ."

[5]"The seller shall not obtain the signature of the buyer to a contract when it contains blank spaces to be filled in after it has been signed."

[6]"In case of failure by any person to comply with the provisions of this chapter, such person or any person who acquires a contract . . . with knowledge of such noncompliance is barred from recovery of any time price differential . . . imposed in connection with such contract . . . and the buyer shall have the right to recover from such person an amount equal to any of such charges paid by the buyer."

tract and note executed by plaintiffs and declared that plaintiffs were not obliged to pay any time price differential accruing before June 2, 1966, the date on which, pursuant to court order, defendants delivered to plaintiffs a completed and dated copy of the contract and note. The court ruled that plaintiffs were entitled to an offset against the amounts due and owing in the amount of $766 because of certain deficiencies in the work done by IBC;[7] it awarded plaintiffs costs and attorney's fees pursuant to section 1811.1 of the Unruh Act. The court also held that defendants could recover the time price differential accruing after June 2, 1966.

1. *The Unruh Act applies to the construction of the residential housing involved in the instant case.*

Subject to certain limitations, not relevant here, the Unruh Act applies to a contract for the sale of goods except such goods as are attached or affixed to real property; the act also applies to contracts for services, whether or not those services are rendered for the improvement of real property. As we point out, the Unruh Act clearly covers the sale of goods and services involved in this case.

The applicability of the Unruh Act to the residential construction here involved turns on the act's definitions of "goods" and "services." Section 1802.1 provides: " 'Goods' means tangible chattels bought for use primarily for personal, family or household purposes . . . and *including goods which, at the time of the sale or subsequently are to be so affixed to real property as to become a part of such real property whether or not severable therefrom . . . .*" (Italics added.) Section 1802.2 states: " 'Services' means work, labor and services, for other than a commercial or business use, including services furnished . . . *in connection with the improvement of real property . . . .*" (Italics added.) The essential distinction drawn by these definitions lies between goods and services acquired for personal use and those obtained for business or commercial purposes. Residential housing by definition serves personal rather than commercial ends.

 Although section 1802.1 applies only to chattels, not real property, the question as to whether the property acquired is real or personal must be fixed not as of the date of the completion of the contract, but as of the date of the execu-

[7]Midwest does not urge on appeal that it was entitled to immunity from this claim as a holder in due course.

tion of the contract. ▮ And although "permanent improvements to land *become* as much realty as the land itself" (italics added) (*Dishman* v. *Union Oil Co.* (1956) 145 Cal.App.2d 261, 266 [302 P.2d 326]), the goods acquired in the instant case (wood, nails, etc.) had not become realty as of October 14, 1962, when plaintiffs signed the contract.

Plaintiffs and IBC agreed to the construction of a house upon plaintiff's real property. Whether the goods involved consisted of the miscellaneous and varied articles of building supplies that were to become part of the dwelling, or a completed dwelling to be affixed to the real property, could make no legal difference. The crucial fact is that at the time of the execution of the contract the dwelling was not attached, or affixed in any way, to the real property owned by plaintiffs. It was "subsequently . . . to be affixed" to the real property owned by plaintiffs. Since the dwelling clearly was not real property at the date of the making of the contract the components of the house necessarily could only be, at that moment, personal property or chattels. If the act covered the separate parts of the house, the act could hardly fail to apply to the integrated whole. Hence the instant contract involved the sale of tangible goods as defined in the Unruh Act.[8]

Section 1802.2 clearly includes *all services* provided for personal purposes, except for the specifically enumerated exceptions; obviously we do not assume that the Legislature intended exceptions other than those it explicitly specified. Accordingly, since the contract for a completed house necessarily involved an undertaking by IBC to provide certain services (delivering the materials to the plaintiffs' lot, etc.), the contract falls under section 1802.2 of the act.

The basic purposes of the Unruh Act support its application to the special case of construction of residential housing of the type here involved. If one seller had agreed to provide materials for the construction of a house, and a second had contracted to fashion those materials into a dwelling, both sellers would clearly supply the sorts of "goods" and "services" with which the act is concerned. Similarly, if IBC had contracted to provide and install an existing prefabricated building we could hardly hold that it had not sold "goods"

---

[8]For the reason stated, the Unruh Act would apply to a sale of land together with a house *to be* constructed thereon. On the other hand, the act would not apply to the sale of land together with an *existing* house thereon. Our reasoning does not indicate, and we are not called upon to decide, whether the act would apply to the sale of an existing house already affixed to land in a case in which that land was to be owned by a party other than the party purchasing the house.

covered by the act. No compelling reason justifies a distinction between these situations and the instant case. ■ The Unruh Act deals with a variety of abuses in the making and enforcement of retail contracts—alterations in contracts, excessive financing charges, unfair garnishment and repossession, etc.[9] The presence and impact of these abuses depend little if at all on the nature or composition of the goods sold; the act should be liberally construed so as to protect consumers.[10]

2. *Midwest had "knowledge" under section 1812.7 of noncompliance with the Unruh Act.*

a. *Noncompliance with section 1803.2.*

■ With regard to the violation of section 1803.2, which requires that the contract and note be contained in a single document, the record reveals that the contract and note were not physically attached to one another. Having been offered two separate documents by IBC,[11] Midwest knew of facts which would have put a reasonable man on inquiry as to whether the note and contract had originally been contained in a single document; a cursory inquiry would have revealed the violation.[12] These factors constitute sufficient "knowledge" under section 1812.7.

■ Although we have never passed upon the question of whether constructive knowledge would suffice to constitute "knowledge" under section 1812.7, several reasons compel that conclusion. When the seller remains the holder, the

[9]See Appendix to the Journal of the Assembly (1959 Reg. Sess.) vol. 2, Report of the Subcommittee on Lending and Fiscal Agencies, pp. 9-10.

[10]Some of the concerns which may have underlain the Unruh Act were touched on by Professor Hogan when he suggested that consumers were "people who are persuaded by persons whom they do not know to enter into contracts that they do not understand to purchase goods that they do not want with money that they have not got." (*A Survey of State Retail Installment Sales Legislation* (1958) 44 Cornell L.Q. 38.) As to the extent of installment purchasing in the United States, see *Minor* v. *Minor* (1960) 184 Cal.App.2d 118, 126 [7 Cal.Rptr. 455].

[11]We cannot say from these factors alone that Midwest had actual knowledge of the section 1803.2 violation, since the record does not reveal whether or not Midwest assumed that the contract and note had become separated after their execution. Similarly, we cannot say with assurance that the use of separate documents was a "term and condition" within the purview of the trial court's holding that Midwest took the note and contract with knowledge of all their terms and conditions.

[12]Plaintiffs argue that Midwest cannot urge lack of the knowledge required by section 1812.7 because the pretrial order did not list "knowledge" of the violations as one of the issues in dispute. We need not reach this question, however, since, as we shall show, the trial court's findings of fact compel the conclusion that Midwest possessed the requisite knowledge.

Unruh Act contemplates that in case of violation an additional cost should be imposed on the seller in that he should bear the amount of the service charge or time price differential. When the holder is other than the seller that "cost" will be borne either by the new holder or by the buyer, depending upon whether the holder acquires the contract "with knowledge" of noncompliance. Effective implementation of the Unruh Act requires that the standards of "knowledge" not be set so high as to permit the easy avoidance of section 1812.7. Without the deterrence of section 1812.7, few incentives will motivate sellers to comply with any of the other provisions of the act.

The important function of section 1812.7 becomes particularly apparent in the case of a seller inclined frequently to violate the act. We recognize that stringent enforcement of section 1812.7 will tend to compel such a retailer to sell his paper at a greater discount and to charge a proportionately higher price for his goods. In all likelihood, this increase in retail prices will deter customers from dealing with such a seller. Moreover, such enforcement will effectuate a proper allocation of possible financial loss. The impact of the violations will be borne, not by a few consumers unable to pass on the loss or in any way "insure" against the effect of a harsh contract, but by finance companies that buy large numbers of notes. Such financiers are obviously better able than buyers to absorb the loss of an occasional bad deal.[13] Finally, strict enforcement will give finance companies, with the knowledge[14] and economic leverage[15] required effectively to police against Unruh Act violations, an incentive to do so.

---

[13]Compare *Mutual Finance Co.* v. *Martin* (Fla. 1953) 63 So.2d 649, 653, "We think the buyer—Mr. and Mrs. General Public—should have some protection somewhere along the line. We believe the finance company is better able to bear the risk of the dealer's insolvency than the buyer and in a far better position to protect his interests against unscrupulous. and insolvent dealers." (See also *Unico* v. *Owen* (1967) 50 N.J. 101, 110 [232 A.2d 405], ". . . the financer-creditor is better able to absorb the impact of a single imprudent or unfair exchange.")

[14]Commentators have suggested that "the determination by the finance company to deal with the seller, involves a much more sophisticated and informed judgment than the similar decision by the consumer." (Hogan, *A Survey of State Retail Installment Sales Legislation, supra,* 44 Cornell L.Q. 38, 66; see also *Unico* v. *Owen, supra,* 50 N.J. 101, 110.) We note that banks and finance companies engage in the business of acquiring commercial paper, and that their continued success in business reflects a highly developed expertise in recognizing unscrupulous retailers and unconscionable contracts, since "collection costs are minimized when good credit standards are used and when flawless contracts are purchased." (Appendix to the Journal of the Assembly (1959 Reg. Sess.) vol. 2, Report of Subcommittee on Lending and Fiscal Agencies, p. 13.)

[15]*Unico* v. *Owen, supra,* 50 N.J. 101, 110.

A liberal interpretation of section 1812.7 will not seriously impede the free flow of commercial paper. Since the venerable case of *Lawson* v. *Weston* (1803) 170 Eng.Rep. 640, 641, some judges and commentators have argued that to limit negotiability "would be at once to paralise the circulation of all paper in the country, and with it all its commerce" (Lord Kenyon). But despite all its supposed importance, negotiability was unknown to Roman law (Radin on Roman Law (1927) p. 310 et seq.) and the negotiability of consumer paper has been somewhat limited in Oregon (Ore.Rev.Stats. 1963, § 83.650(1), (2)), Massachusetts (Ann. Laws Mass. (1966 Supp.) ch. 255, § 12(c)), and California (Civ. Code, § 1804.2, by the amendment of Stats. 1967, ch. 1294, p. 3098, § 2), without apparent ill effect. And, as was indicated by the Florida Supreme Court in *Mutual Finance Co.* v. *Martin* (Fla. 1953) 63 So.2d 649, 653, an increased burden on the finance companies would be a sure sign that negotiability had previously worked a corresponding injustice on retail purchasers.

In many other areas of the law we have imputed knowledge in the presence of information sufficient to put a reasonable man on inquiry. (See, e.g., *Harmon Lbr. Co.* v. *Brown* (1913) 165 Cal. 193, 197 [131 P. 368]; *Lady Washington etc. Co.* v. *Wood* (1896) 113 Cal. 482, 487 [45 P. 809]; *People* v. *Beck* (1945) 71 Cal.App.2d 637 [163 P.2d 41].) Frequently we have applied section 19 of the Civil Code, which provides: "Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact." Indeed the failure of the assignee under circumstances such as those in the instant case to exercise due care lest the buyer's rights be cut off might give rise to an action in tort. (See *Biakanja* v. *Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358].) Accordingly, ample precedent upholds the sufficiency of constructive knowledge to meet the requirements of section 1812.7.

The principal argument against such a view of section 1812.7 is that in California, as in most states, a holder in due course does not bear a duty to investigate suspicious circumstances when he acquires commercial paper. (*Popp* v. *Exchange Bank* (1922) 189 Cal. 296, 303 [208 P. 113].)[16] But

[16]The history of the rule stated in *Popp*, moreover, indicates that it lacks the vitality needed to require its application in the related section 1812.7 problem. (See generally, Littlefield, *Good Faith Purchase of Consumer Paper: The Failure of the Subjective Test* (1966) 39 So.Cal.L.Rev.

since by section 1804.2 the Legislature has effectively repealed *Popp* for contracts falling under the Unruh Act, we are not compelled to extend the reasoning of *Popp* to an analogous problem.

---

48.) In *Lawson* v. *Weston, supra,* 170 Eng. Rep. 640, Lord Kenyon held that a holder bore no duty to make inquiries absent suspicious circumstances, but indicated (p. 641) that the situation would be different were such circumstances present. Later, in *Gill* v. *Cubitt* (1824) 107 Eng. Rep. 806, Abbott, C.J., Bayley, J., and Holroyd, J., all concluded that even without suspicious circumstances a holder could not discount a bill without making inquiry into its origin. The reaction against *Gill* brought a result more conservative than *Lawson*; in *Goodman* v. *Harvey* (1836) 111 Eng. Rep. 1011, Lord Chief Justice Denman held that even gross negligence in the face of suspicious circumstances would not alone preclude holder in due course status. *Gill* quickly came to be regarded as standing for a duty to inquire into suspicious circumstances, and many American courts followed it until about the end of the nineteenth century. (See cases cited, 2 Daniel on Negotiable Instruments (1933) 935 fn. 38; 7 American Digest (1899) §§ 821-823, pp. 1100-1104; *Mee* v. *Carlson* (1908) 22 S.D. 365 [117 N.W. 1033, 29 L.R.A. N.S. 351].) When the question first arose in California (*Schoen* v. *Houghton* (1875) 50 Cal. 528), the parties debated the continued vitality of *Gill* but we decided that case without explicitly passing on *Gill*. Subsequently, the view of Denman in *Goodman* gained general acceptance and we adopted it in 1922. (*Popp* v. *Exchange Bank, supra,* 189 Cal. 296, 303.)

Since 1922, however, the wisdom of applying *Goodman* to retail sales has been widely questioned. The value of commercial paper sold by retailers to banks and finance companies has increased from $111 million in 1920 (Banking and Monetary Statistics (1965 Supp.) § 16) to $23,100 million in 1962 (Statistical Abstract (1962) p. 465). Over the same period the fraction of all consumer notes sold to banks and finance companies has grown from 5 percent to over 60 percent. ''In the yesterday of business the ordinary retail purchaser of goods had but one relationship to his merchant, that of credit extended on a personal, unsecured promise to pay. The average citizen, and particularly the financially unimportant, was no more likely to know the law of negotiable paper, or the parol evidence rule, than the holding in Shelley's Case. But almost overnight the picture changed, and today, from basinette to burial, the conditional sale contract is the constant companion of our citizenry.'' (*Buffalo Industrial Bank* v. *De Marzio* (1937) 162 Misc. 752 [296 N.Y.S. 783, 785], revd. by default 6 N.Y.S.2d 568.) The committee which recommended the Unruh Act reported, ''As was brought out in public hearings, practically all of the [consumer] complaints involved financing agencies.'' (Appendix to the Journal of the Assembly, *supra,* vol. 2, Report of the Subcommittee on Lending and Fiscal Agencies, p. 13.) This tremendous increase in the sale of consumer notes to holders in due course has produced a variety of responses by the courts in an effort to protect the consumers. (See generally, Littlefield, *Good Faith Purchase of Consumer Paper: The Failure of the Subjective Test, supra,* 39 So.Cal. L.Rev. 48; *Finance Companies and Banks as Holders in Due Course of Consumer Installment Credit Paper* (1960) 55 Nw.U.L.Rev. 389; Note (1954) 102 U.Pa.L.Rev. 782.) In many states the application to consumer sales of the holder in due course rule itself has been sharply limited by statute (see Comment (1967) 76 Yale L.J. 745, 766, 767, fns. 137, 138). Accordingly, even if the Legislature had not enacted section 1804.2 (repealing the holder in due course rule for consumer sales) we would question the wisdom of *Popp* in view of events since 1922, and would certainly not extend the rule of *Popp* to the knowledge requirement of section 1812.7.

We therefore conclude that the requirement of section 1812.7 as to "knowledge" is satisfied if the holder possesses knowledge of facts sufficient to put a reasonable man on inquiry. ▇ In some other situations prior complaints against the seller or an unusually high discount rate might provide the needed suspicious circumstance,[17] but here the fact that IBC offered Midwest a contract and note on separate sheets of paper clearly put Midwest on notice that a violation of section 1803.2 was a likelihood if not a certainty.

b. *Noncompliance with section 1803.4.*

▇ The trial court held that although Midwest filled in some of the blank spaces in the note, it did not do so with any intent to defraud or otherwise damage plaintiffs. Midwest must have known that the note contained blank spaces when executed; having filled in those omissions itself, Midwest cannot contend that the spaces were not intended to be "filled in" after execution of the note. Thus Midwest must have known that IBC had violated section 1803.4 providing that the "seller shall not obtain the signature of the buyer to a contract when it contains blank spaces to be filled in after it has been signed."

c. *Noncompliance with section 1803.1.*

▇ The trial court also found that Midwest accepted the assignment with "full knowledge of all of the terms and conditions" of the note and contract. Clearly, the date of the promissory note, or, more precisely, the lack of a date on the promissory note, constitutes a "term and condition" of the note. Accordingly, the trial court in effect held Midwest to have had knowledge of facts constituting a violation of section 1803.1 of the Civil Code.

d. *The relationship between Midwest and IBC*

▇ The agreed statement of facts contains items[18] which suggest that Midwest may have been closely connected with IBC, but the record does not demonstrate that Midwest and IBC were so closely intertwined as to warrant the designation of Midwest as a party to the original transaction with knowledge of all the admitted violations.

---

[17] See *Witty* v. *Clinch* (1929) 207 Cal. 779, 784 [279 P. 797].

[18] IBC assigned the contract and note to Midwest within a few weeks after their execution by plaintiffs. Midwest knew that the note and contract arose out of the same transaction and were executed simultaneously even though this is not apparent on the faces of those documents. And IBC left blank spaces in the contract for Midwest to complete.

■ In California, as elsewhere, a financing institution may be denied the status of a holder in due course because it is too closely connected with the seller or the particular sale at issue.[19] We considered the problem in *Commercial Credit Corp.* v. *Orange County Machine Works* (1950) 34 Cal.2d 766 [214 P.2d 819]. In that case the finance company actually supplied the vendor with forms, twice consulted with the vendor about the impending deal, knew all the details of the transaction in advance, had financed prior sales by the same firm, and served as an essential moving force behind the sale. We held that the finance company should be treated as a party to the original transaction rather than as a holder in due course.[20]

■ As has been suggested by other courts,[21] the gravamen of the *Commercial Credit* rule is that the seller accepts the buyer's note and extends credit, not on his own behalf, but as an agent for the finance company. As the Assembly Subcommittee on Lending and Fiscal Agencies which recom-

---

[19]A number of policies underlie the rule that a financial institution should not be considered as a holder in due course because of its close affiliation with the holder. (See, e.g., Note (1967) 14 U.C.L.A. L.Rev. 879, 900 fn. 83, ''To the extent that the finance company has a close association with the seller, it is in a better position to discover and police the legality of the seller's contracts with the buyer. Furthermore, since neither the seller nor the financing agency normally intends any further negotiation of the instrument, the general policy behind granting holder in due course status to a purchaser—to further the free transferability of commercial paper—is not applicable to the typical retail installment sale.'' Note (1940) 53 Harv.L.Rev. 1200, ''By abandoning the test of the 'white heart and the empty head' in the case of the transferee who is more like an original party to the transaction than a subsequent purchaser, this decision increases the protection afforded the consumer who has not received what he was promised.'') (Commenting on *Commercial Credit Co.* v. *Childs* (1940) 199 Ark. 1073 [137 S.W.2d 260, 128 A.L.R. 726]; see also *Unico* v. *Owen, supra,* 50 N.J. 101, 109-110.) In *Buffalo Industrial Bank* v. *De Marzio, supra,* 296 N.Y.S. 783, revd. by default 6 N.Y.S.2d 568, Justice Summers persuasively criticized the often artificial distinction between retailer and finance company.

[20]In *Commercial Credit* we did not explicitly specify the standards required for the application of the rule to that case. In applying the close-connection rule, courts seem to have varied quite widely as to which facts are sufficient to negate the status of holder in due course. (Compare *Unico* v. *Owen, supra,* 50 N.J. 101, and *Mutual Finance Co.* v. *Martin, supra,* 63 So.2d 649, with *Mann* v. *Leasko* (1960) 179 Cal.App.2d 692, 699 [4 Cal.Rptr. 124], and *United States* v. *Tholen* (N.D. Iowa 1960) 186 F.Supp. 346.)

[21]*Oceanview Memorial Park* v. *Caminetti* (1943) 59 Cal.App.2d 703, 710 [139 P.2d 674]; *Bastian-Blessing Co.* v. *Stroope* (1941) 203 Ark. 116 [155 S.W.2d 892]; *Palmer* v. *Associates Discount Corp.* (D.C. Cir. 1941) 124 F.2d 225 [74 App. D.C. 386]; *International Harvester Co.* v. *Watkins* (1928) 127 Kan. 50 [272 P.2d 139, 61 A.L.R. 687]; Comment (1965) 10 Vill.L.Rev. 309, 311.

mended the Unruh Act described the typical situation, "'Time price' [installment sales] as originally started in England, was a situation in which a businessman was selling to the buyer and was handling the entire transaction himself and that was the basis for the theory that a cash price and time price might be different. However, as it developed, and particularly speaking of the area with which we are familiar, that is not the situation. The seller has no intention of extending credit. Previous arrangements are made with the finance company to finance the sale. . . . [T]he time price . . . is only a way of getting around the constitutional and legislative acts.'' (Appendix to the Journal of the Assembly, *supra*, vol. 2, Report of the Assembly Interim Committee on Finance and Insurance, p. 14.)

To invoke the rule in *Commercial Credit* the buyer must show that the seller contemplated that the credit would in fact be advanced by, and the note in fact held by, the particular financing institution[22] involved, since such proof would amount to a demonstration of ratification of an undisclosed agency.[23]

The above agency principles which we have applied to parties claiming holder in due course status pertain equally to parties claiming that they lacked the knowledge required by section 1812.7.[24] The instant statement of facts provides no adequate information, however, as to what the seller contemplated at the time of the sale. If Midwest had

---

[22]The ''contemplated'' finance company need not be the first finance company to acquire the note from the seller, since any such requirement would lead to easy evasion of *Commercial Credit*. (Note (1950) 23 So.Cal. L.Rev. 580, 583.) On the other hand, one purchasing from the contemplated holder would be a holder in due course absent some further special circumstances. (See Note, *supra*, 53 Harv.L.Rev. 1200, 1201.)

[23]See, e.g., *Moynough* v. *Empress Gold Min. Co.* (1935) 6 Cal.App.2d 674 [45 P.2d 659], a case in which the court held an undisclosed principal to have ratified the actions of his agent. There the agent purported to purchase for himself an option on certain mining property, although in fact the money for the purchase ultimately came from the undisclosed principal, who reimbursed the agent after the sale for all money advanced by him and who accepted in return an assignment of the option.

[24]The fact that the seller benefits from the finance company's extension of credit does not impair the agency; such a benefit exists, for example, when an agent arranges loans by his principal on a commission basis. The many factors present in *Commercial Credit* were all evidence that the seller there contemplated that the finance company concerned would in fact finance the deal; there was of course also evidence that the finance company contemplated that it would purchase the buyer's note, but even absent this element the finance company ratified the agency when it accepted the benefit of the arrangement that the seller had made by purchasing the buyer's note.

provided IBC with forms for bills of sale or notes, that conduct would strongly suggest the required expectation, but the record contains no showing of any such arrangement. If Midwest had purchased a substantial number of such notes from IBC in the past, that factor too would weigh heavily, but plaintiffs do not establish any such practice. If Midwest's name had been on the note when the buyer signed it, or if Midwest had inquired into the buyer's credit rating, such evidence would indicate that IBC contemplated Midwest's acquisition of the note, but neither of these factors were present. If IBC had assigned the note to Midwest on the day plaintiffs executed it, such assignment might have raised a presumption as to IBC's expectations, but we know only that IBC assigned the note within three months.[25] Accordingly, we cannot on the record before us impute to Midwest as an original party to the transaction the knowledge required by section 1812.7.

3. *The trial court properly awarded attorney's fees and costs.*

 The trial court correctly awarded plaintiffs attorney's fees and costs in this action for declaratory relief. Section 1811.1 of the Unruh Act provides that: ''Reasonable attorney's fees and costs shall be awarded to the prevailing party in any action on a contract or installment account subject to the provisions of this chapter regardless of whether such action is instituted by the seller, holder or buyer.'' Although some of the relief sought in this case was arguably of a declaratory nature, section 1811.1 still applies. The legislative history of the section requires us to interpret liberally the phrase ''on a contract.''

The Assembly Subcommittee on Lending and Fiscal Agencies which recommended the Unruh Act explained the purpose of section 1811.1 as follows: ''Most important, perhaps, is the inability to retain legal services, for attorneys understandably shy away from taking cases when they are uncertain of the outcome and are not sure they will be able to collect their fees. . . . Section 1811.1, in addition to giving the holder the right to collect reasonable attorney's fees and actual court costs, further provides that in any action, whether instituted by the seller, holder or buyer, attorney fees and costs will be awarded to the prevailing party. This provision will encourage attorneys to accept cases when the buyer has a good

---

[25]See the factors enumerated in *Unico* v. *Owen, supra,* 50 N.J. 101, 112-113.

defense against an action instituted by the seller or holder or when the buyer wishes to institute an action for such rights as he may have." (Appendix to the Journal of the Assembly, *supra*, vol. 2, Report of Subcommittee on Lending and Fiscal Agencies, p. 23; see also Comment, *supra*, 76 Yale L.J. 745, 765, 790.)

The committee clearly intended no limitation on the type of action covered by section 1811.1 so long as the subject matter involved a contract subject to the provisions of the Unruh Act. ▮▮▮▮ Indeed, a contrary construction would unduly burden the application of the act to cases such as the one before us; to collect attorney's fees the buyer would be compelled either to sue for the return of the interest following each monthly payment for six years, or to refuse payment of any interest and risk acceleration of the entire loan. Accordingly, the legislative history of section 1811.1 and the general purpose of the Unruh Act require that reasonable attorney's fees and court costs be awarded in the instant case.

*4. Section 1812.7 bars recovery of any time price differential.*

▮▮▮▮ The trial court prohibited collection of the time price differential accruing prior to June 2, 1966, the day on which defendants, acting under court order, provided plaintiffs with a copy of the contract containing the changes and additions. The trial court did, however, allow defendants to collect a time price differential after June 2. Collection of a time price differential before *or after* June 2 is not permitted by the Unruh Act. Section 1812.7 provides that in case of violation the violator or any person acquiring with knowledge of the violation "is barred from recovery of *any* time price differential or service charge . . . ." (Italics added.) ▮▮▮▮ The holder of a note or contract may correct a violation by delivering to the buyer a corrected copy of the agreement, but such correction must be made "within 30 days of the execution of the original contract by the buyer." (Civ. Code, § 1812.8.) ▮▮▮▮ Since plaintiffs executed the original contract and note on or about October 14, 1962, the delivery of the corrected copy on June 2, 1966, came several years too late.

*5. Conclusion*

The Unruh Act represents a constructive effort by the Legislature to protect consumers in the State of California in the all-important area of installment contracts. In interpreting the act we must seek the achievement of the legislative

purpose of according to consumers who are parties to such contracts the full protection of the salutary statute. We must particularly avoid the emasculation of section 1812.7 by a too ready acceptance of the excuse of a finance company that it lacked the ''knowledge'' required by that section. Accordingly, we hold that the section requires only the holder's constructive knowledge; it does not sanction any unsupportable claim of ''innocence.''

That part of the judgment which provides that the holder of the contract is entitled to collect the time price differential accruing after June 2, 1966, is reversed. In all other respects the judgment is affirmed. Plaintiffs-appellants shall recover costs on appeal.

Traynor, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J. concurred.