[Civ. No. 33020. First Dist., Div. Four. Jan. 31, 1975.]

HAL F. SEIBERT, Plaintiff and Appellant, v.
SEARS, ROEBUCK & COMPANY, Defendant and Respondent.

[And 10 other cases.]*

* Seibert v. Grodins of California, Inc. (Civ. No. 33020); Seibert v. Macy's of California (Civ. No. 33020); Gaul v. Montgomery Ward & Company, Inc. (Civ. No. 33020); Gaul v. Smiths Clothiers of California (Civ. No. 33020); Duskey v. Goldman's (Civ. No. 33020); Laub v. Breuners, Inc. (Civ. No. 33020); Siegal v. Joseph Magnin Company, Inc. (Civ. No. 31184); Jessen v. Broadway-Hale Stores, Inc. (Civ. No. 31804); Seibert v. Roos/Atkins (Civ. No. 31811); Chase v. Ames Mercantile Company, Inc. (Civ. No. 31812).

## COUNSEL

Schwartz & Alschuler, Schwartz, Alschuler & Grossman, Marshall B. Grossman, Seyranian & Seibert, Leon G. Seyranian, Hal F. Seibert, Tunney, Carlyle & Bennett, Tunney, Carlyle, Rogers & Brogdon, Gerald P. Tunney, David Daar and Florence Bernstein for Plaintiffs and Appellants.

Crosby, Heafey, Roach & May, Jones, McCue & Hall, Jones, McCue, Hall & Genard, Jacobs, Sills & Coblentz, Sheppard, Mullin, Richter & Hampton, Thomas E. Waterman, Heller, Ehrman, White & McAuliffe, Richard L. Goff, MacFarlane, Schaefer & Haun, Jeremy V. Wisot, O'Melveny & Myers, Robert Wahrhaftig, Downey, Brand, Seymour & Rohwer, John F. Downey, Richard D. Waugh, Pillsbury, Madison & Sutro, James B. Atkin, Noble K. Gregory, Buchman, Kass & Shapiro, Stephen M. Kass, Charles W. Bender, Don T. Hibner, Michael D. Zimmerman and Michael H. Salinsky for Defendants and Respondents.

## OPINION

**RATTIGAN, Acting P. J.**—These five appeals are from judgments which concluded eieven separate actions commenced in the Superior Courts of

Alameda County and the City and County of San Francisco. The defendant in each action is a major retail merchant whose practices in selling on installment credit are regulated by the Unruh Act (Civ. Code, div. 3, pt. 4, tit. 2, ch. 1 ["Retail Installments Sales"], commencing with § 1801.)[1] Despite the multiple origins of the appeals, a principal question on each of them is whether the various defendants (respondents in this court) are complying with the Act, as properly interpreted, in the computation and collection of finance charges billed to credit customers. The challenged judgments were entered in different procedural sequences, but upon facts which were substantially identical as pleaded in each of the actions and which are not materially disputed in any of them. Because the principal legal issue and the factual elements are thus common to all of them, we dispose of the five appeals in this single decision.

*1 Civil 33020*

*The Alameda County Actions*

Among the eleven actions mentioned, seven were commenced in the Alameda County Superior Court between December 1970 and July 1971. Each of these (to which we hereinafter refer on occasion as "the Alameda County actions") was brought against a separate defendant by an individual who (1) named as plaintiffs therein himself (or herself) "and all persons similarly situated," (2) made allegations in the complaint to the effect that he (or she) was maintaining a class action on behalf of himself (or herself) and others as members of "the class of persons maintaining retail installment accounts with [the respective] defendant," (3) further alleged that the defendant was violating the Unruh Act in stated respects as to all members of "the class," and (4) sought various forms of relief. (The parties and pleadings in the Alameda County actions are hereinafter described in further detail.)

In a joint pretrial conference order, the trial court ordered the seven Alameda County actions consolidated for trial. In the order, the court also defined eleven issues for trial, of which the first eight dealt with "liability" (i.e., whether the defendants were violating the Unruh Act as alleged in the several complaints) and ancillary matters; the other three involved the propriety and management of the actions as class actions.

[1]Except where otherwise indicated, all statutory references herein are to sections of the Civil Code which appear in the Unruh Act (to which we hereinafter refer as such or as "the Act").

The court further ordered the trial bifurcated into two phases, with the eight "liability" issues to be tried in the first phase.

After a nonjury trial of the liability phase of the consolidated actions, the court filed findings of fact and conclusions of law in the defendants' favor and entered a single judgment which denied relief in all seven actions and terminated them. In 1 Civil 33020, each of the individual Alameda County plaintiffs joins in an appeal from this judgment.[2]

### 1 Civil 31184, 31804, 31811 and 31812

### The San Francisco Actions

The remaining four actions ("the San Francisco actions") were filed in the San Francisco Superior Court in December 1970, and February 1971. Again, each was brought against a separate defendant as a class action maintained by an individual on behalf of himself (or herself) "and all persons similarly situated"; in this respect, in alleging membership of the plaintiff "class" and violations of the Unruh Act, and in terms of the relief sought in each, the San Francisco complaints were identical (for our purposes) with those filed in the Alameda County actions. In each of the San Francisco actions, the trial court sustained a general demurrer to the complaint without leave to amend and entered a judgment of dismissal. In 1 Civil 31184, 31804, 31811 and 31812, each of the San Francisco plaintiffs appeals from the respective judgment dismissing his or her action.

### 1 Civil 33020

Although the Alameda County actions involved materially undisputed facts and a single legal issue requiring interpretation of the Unruh Act, they were tried at length and in detail.[3] For this reason (and unlike the San Francisco appeals, which present the same question of law but on abbreviated records because they originated at the demurrer stage in each instance), the Alameda County record is a comprehensive basis for

[2]In their single notice of appeal from the judgment, the Alameda County plaintiffs also purport to appeal "from all adverse rulings affecting plaintiffs' rights, including, but not limited to," two rulings which are specified. Although some of these matters are subject to review on the appeal from the judgment, they are nonappealable as such (Code Civ. Proc., §§ 904, 904.1; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 30 [p. 4045], 36 [pp. 4050-4051], 62 [p. 4077].) The purported appeals from them must therefore be dismissed.

[3]The trial lasted for 14 court days and involved the actual or stipulated testimony of some 40 witnesses, several matters judicially noticed, and 171 documentary exhibits. The record on the Alameda County appeal exceeds 3,100 pages in length.

our review of all the judgments before us. Although its sheer length precludes a summary of all the facts received in evidence (see fn. 3, *ante*), we first recite some of them, as found in part by the trial court, by way of background and in terms of the indicated provisions of the Unruh Act itself.[4]

## Background Facts and the Unruh Act

The Act provides for, and regulates, two arrangements under which retail installment credit is extended to a "buyer" by a "seller" in California.[5] One plan is the so-called "closed-end contract," which is not directly involved in the present actions but which should be described for the purpose of distinguishing it and because of certain parallels in the statutory treatment of both arrangements. The Act refers to the closed-end plan as a "retail installment contract," or "contract." (§ 1802.6.) It involves a written contract, between the store and the customer, which is executed in a specified form at the time a particular purchase is made; a down payment by the customer at that time; a "finance charge" which is defined in section 1802.10,[6] calculated when the contract is prepared, and added (together with other charges permitted by the Act, if they are applicable in the transaction) to the unpaid balance of the sale price; and a provision in the contract wherein the customer agrees to pay the resulting total (the "amount financed") in a scheduled sequence of fixed consecutive payments. (§§ 1803.1-1803.3.) The precomputed finance charge is calculated by multiplying a fixed percentage of the "amount financed" by the number of months between

[4]Announcing his intended decision in defendants' favor, the Alameda County trial judge wrote an elaborate opinion ("Memorandum Of Decision") in which he outlined his reasoning at length. We may resort to his opinion for the purpose of determining the process by which he arrived at the decision embodied in his formal findings (*Henderson v. Fisher* (1965) 236 Cal.App.2d 468, 472 [46 Cal.Rptr. 173]; 6 Witkin, Cal. Procedure [*op. cit. supra*] Appeal, §§ 231-232, pp. 4221-4222); in the present case, in fact, the judge wrote the full substance of his opinion into the findings themselves. The combination has been most useful to this court in reviewing the complex questions presented, and this fact should be acknowledged.

It also bears mentioning that the trial court's opinion and findings were long and detailed, as this decision is. This is attributable to the complicated facts and issues presented and to the high stakes: the record indicates that these actions could affect millions of retail credit customers, and that the amount of credit involved runs to hundreds of millions of dollars.

[5]It is undisputed on these appeals that each individually named plaintiff is a "retail buyer," or "buyer," and that each defendant is a "retail seller," or "seller," as those terms are respectively defined in sections 1802.3 and 1802.4. For convenience, we occasionally refer to any plaintiff as a "customer" and to any defendant as a "store."

[6]As pertinent, section 1802.10 provides: " 'Finance charge' means the amount however denominated or expressed which the retail buyer *contracts to pay or pays for the privilege of purchasing goods or services to be paid for by the buyer in installments . . . .*" (Italics added.)

the date of purchase and the date of the last scheduled installment payment. (See §§ 1802.11, 1805.1.) Installment purchases of other items by the same customer, if made on the same closed-end basis, are made under separate contracts or under appropriate "add-on" provisions, as permitted and regulated by the Act, in a single contract. (§§ 1808.1-1808.6.)

The other credit arrangement offered is the so-called "revolving charge account," which is the subject of all of the present actions and which is denominated " 'retail installment account' or 'installment account' or 'revolving account' " in section 1802.7, which also defines it and its terms.[7] The revolving account is established by a single agreement between the store and the customer without a down payment by the latter, and it operates so as to permit the customer to make continuing credit purchases from time to time without having to enter into a new contract, or contract revision, on the occasion of each new credit purchase. The agreement provides for minimum monthly installment payments, but the customer is given the option to make payments in excess of the minimum monthly amount at any time.

The revolving account also carries a "finance charge" as defined in section 1802.10 (quoted in fn. 6, *ante;* see also § 1802.7, quoted in fn. 7, *ante*), but the Unruh Act does not require its precomputation as in the case of a closed-end contract; instead, it is periodically calculated on the basis of monthly "balances" as provided in section 1810.2.[8] Such "balances" are billed to the customer on statements which are sent to

[7] The section provides: "1802.7. 'Retail installment account' or 'installment account' or 'revolving account' means an account established by an agreement entered into in this state, pursuant to which *the buyer promises to pay,* in installments, to a retail seller, *his outstanding balance* incurred in retail installment sales, whether or not a security interest in the goods sold is retained by the seller, *and* which provides for a finance charge which is expressed as a percent of the *periodic balances* to accrue thereafter providing such charge is not capitalized or stated as a dollar amount in such agreement." (Italics added.)

[8] "1810.2. Subject to the other provisions of this article the seller or holder of a retail installment account may charge, receive and collect the finance charge authorized by this chapter. The finance charge shall not exceed the following rates *computed on the outstanding balances from month to month:*

"(a) On so much of the *outstanding balance* as does not exceed one thousand dollars ($1,000), 1-½ percent.

"(b) If the *outstanding balance* is more than one thousand dollars ($1,000), 1 percent on the excess over one thousand dollars ($1,000) of the outstanding balance.

"(c) If the finance charge so computed is less than one dollar ($1) for any month, one dollar ($1).

"(d) The finance charge may be computed on a schedule of fixed amounts if as so computed it is applied to all amounts of *outstanding balances* equal to the fixed amount minus a differential of not more than five dollars ($5), provided that it is also applied to all amounts of *outstanding balances* equal to the fixed amount plus at least the same differential." (Italics added.)

him after the close of his monthly "billing cycle," a time period which is defined in section 1802.17.[9] Section 1810.1 requires a written disclosure to the customer, covering these matters and others, at the inception of any revolving account.[10] The contents of each monthly statement are prescribed in section 1810.3.[11] Because of its convenience, the revolving account has largely replaced the "closed-end contract" arrangement in this state. Some California retailers began offering revolving accounts in the 1940's, and most major retailers were offering such accounts by the mid-1950's.

[9]"1802.17. 'Billing cycle' means the time interval between regular *monthly* billing statement dates." (Italics added.) A "billing cycle" need not be a named calendar month: in common practice, a given "cycle" will run from any date in one month to the corresponding date in the next one.

[10]As pertinent, section 1810.1 provides:

". . . [B]efore the first transaction is made on any retail installment account, the seller shall disclose to the buyer in a single written statement, which the buyer may retain, . . . each of the following items, to the extent applicable:

"(a) The conditions under which a finance charge may be imposed, including an explanation of the time period, if any, within which any credit extended may be paid without incurring a finance charge.

"(b) *The method of determining the balance* upon which a finance charge may be imposed.

"(c) The method of determining the amount of the finance charge, including the method of determining any minimum charge which may be imposed as a finance charge.

"(d) Where one or more periodic rates may be used to compute the finance charge, each such rate, the range of balances to which it is applicable, and the corresponding annual percentage rate determined by multiplying the periodic rate by the number of periods in a year.

". . . . . . . . . . . . . . . . . . .

"(g) The minimum periodic payment required. . . ." (Italics added.)

[11]"(a) . . . [T]he seller of any retail installment account shall mail or deliver to the buyer for each billing cycle at the end of which there is an outstanding debit balance in excess of one dollar ($1) in that account or with respect to which a finance charge is imposed, a statement or statements which the buyer may retain, setting forth in accordance with subdivision (b) each of the following items to the extent applicable:

"(1) The *outstanding balance in the account at the beginning of the billing cycle, using the term 'previous balance.'*

"(2) The amount and date of each extension of credit or the date such extension of credit is *debited* to the account during the billing cycle and, unless previously furnished, a brief identification of any goods or services purchased or other extension of credit.

"(3) The total amounts *credited* to the account during the billing cycle for payments, using the term 'payment,' and for other credits including returns, rebates of finance charges, and adjustments, using the term 'credits,' and unless previously furnished, a brief identification of each of the items included in such other credits.

"(4) The amount of any finance charge, using the term 'finance charge,' debited to the account during the billing cycle, itemized and identified to show the amounts, if any, due to the application of periodic rates and the amount of any other charge included in the finance charge, such as a minimum charge, using appropriate descriptive terminology.

"(5) Each periodic rate, using the term 'periodic rate' (or 'rates'), that may be used to compute the finance charge (whether or not applied during the billing cycle), and the range of balances to which it is applicable.

"(6) *The balance on which the finance charge was computed and a statement of how that*

### The "30-Day Account"

It is necessary to mention that, in addition to the "closed-end contract" and the revolving account, the stores also offer so-called "30-day accounts," under which the customer is extended credit for a purchase subject to his agreement to pay the full sale price, as billed, within a period of time which will not exceed 30 days and which will not involve installment payments. If he pays on time as agreed, no finance charge is assessed at all. As is clearly shown by the sections of the Act which define the closed-end "retail installment contract" and the alternative "revolving account," each of these two arrangements must originate in a "retail installment sale" in order to fall within the reach of the Act. (See §§ 1802.6-1802.7.) Section 1802.5 defines a " 'retail installment sale' " as a sale made "for a deferred payment price payable in installments." Because the customer with a 30-day account does not initially agree to pay "a deferred payment price payable in installments," his account does not originate in a "retail installment sale" and is not subject to the Unruh Act.

According to the evidence, however, a customer holding a 30-day account will commonly choose not to pay his full indebtedness within the short-term time limit and will maintain his credit status by agreeing that his indebtedness shall be treated as a "deferred payment price payable in installments." This is arranged by agreement with the store, whose credit promotional practices typically encourage it. When it occurs, the transaction under which the customer originally held a 30-day account becomes a "retail installment sale" (§ 1802.5) because of his agreement to that effect, and his erstwhile 30-day account becomes a revolving account as previously defined, subject to regulation by the Act and to the assessment of the cyclical finance charges previously described.

### The Revolving Account As It Works
### Within the Statutory Scheme

When a customer opens a revolving account (whether in the first instance or by conversion from a 30-day account as just described), he enters a sequence of consecutive monthly billing cycles for which statements are sent him, at the close of each, as required by section

balance was determined. If any balance is determined without first deducting all credits during the billing cycle, that fact and the amount of such credits shall also be disclosed.

"(7) The closing date of the billing cycle and the outstanding balance in the account on that date, using the term *'new balance,'* accompanied by the statement of the date by which, or the period, if any, within which, payment must be made to avoid additional finance charges. . . ." (Italics added.)

1810.3. (See fn. 11, *ante.*) In any cycle, he ordinarily *does* make a payment on account as agreed,[12] and he *may*—and frequently does—make a payment in excess of the agreed monthly minimum. In the same cycle, he may also make additional purchases which are debited to the account. At the close of any one cycle, and also in compliance with section 1810.3 (see *ibid.*), the statement covering the cycle will show the debits incurred and the credits given—for payments made or for other reasons[13]—during that cycle.. If he still owes a net indebtedness at the end of the cycle, it is shown on the statement as a net closing balance.

That closing balance will appear as an opening balance on the statement he receives at the end of, and which covers, the next cycle; as required by section 1810.3, subdivision (a), paragraph (1), this opening figure will be designated on the statement by the term "previous balance." (See fn. 11, *ante.*) The statement for the next cycle will again show debits and credits as they occurred during that cycle, to which we now refer as the "current cycle." The statement will also show a finance charge for the current cycle. As the results of the intercyclical progression of "balances" as described, and of ongoing activity in the account during the current cycle, there are several figures which may be used *arithmetically* as the basis of calculating the finance charge which is billed for the current cycle. The present controversy requires definition of the figure (or figures) which may be *legally* used for that purpose according to the Unruh Act. The alternative figures appear among four methods of calculating the charge which are recognized in the techniques of the retail installment credit industry, and which are described as follows:

(1) *The Previous Balance Method.* Under this method, the finance charge for the current cycle is computed on the basis of the "previous balance" which was shown as the closing (or "ending") balance on the statement for the preceding cycle and as the opening balance ("previous balance") on the statement for the current cycle. It is so used without regard to debits charged for purchases made in the current cycle. It is also used without regard to credits granted, for payments made on the account or for other reasons (see fn. 13, *ante*) during the current cycle, *unless* the sum of any such credits equals or exceeds the "previous balance" and thereby, in effect, cancels it. If such cancellation occurs, no finance charge is assessed for the current cycle at all.

---

[12]The problem of delinquency, by reason of a customer's failure to make an agreed minimum monthly payment, is not involved on these appeals.

[13]Credit is commonly, if not invariably, given when merchandise, once purchased and charged, is returned at the whim of the customer or because it is defective. When that occurs, the customer's revolving account is credited with all or part of the amount involved, and the transaction appears as a credit item in the account.

If such cancellation has not been effected, neither debits nor credits shown in the statement for the current cycle are taken into account, and the finance charge is computed and billed by application of the section 1810.2 percentages to the "previous balance" alone. Calculated on this basis, the charge for the current cycle will be 1-½ percent of the amount of the previous balance which does not exceed $1,000 plus 1 percent of the amount, if any, by which it does.[14] The distinctive features of the previous balance method may be reiterated as follows: (a) Credits granted in the current cycle are acknowledged only if they cancel the previous balance, in which case no finance charge is made for the cycle; (b) they are ignored in the charge calculation if they do not produce that result; and (c) debits incurred in the current cycle are always ignored in the calculation of the finance charge.

(2) *The Adjusted Balance Method.* Under this method, *credits* posted to the account during the current cycle are subtracted from the "previous balance" shown as the opening balance on the statement covering the cycle. The result is an "adjusted balance" which is used for the basis of calculating the finance charge shown on the statement. The distinctive feature of this method is that current *credits* are taken into account in computing the charge but current *debits* are not: the net result obviously works to the customer's advantage alone.

(3) *The Ending Balance Method.* When this method is used, the sum of debits charged to the account during the current cycle are added to the "previous balance" shown on the statement, credits granted during the cycle are subtracted from it, the net balance between them is struck as of the cycle's closing date, and the finance charge is calculated on the basis of the result (which is a new "ending balance" for the current cycle). The distinctive feature of this method is that current debits *and* current credits are both reflected in the calculation of the finance charge for the current cycle.

(4) *The Average Daily Balance Method.* Under this method, the sum of the actual daily balances in the account during the current cycle is divided by the number of days in the cycle, and the quotient is used as the basis for calculating the finance charge.

The previous balance method has been the method predominantly used by stores since revolving credit accounts were first established in the California retail trade; the evidence identified 31 retailers who currently

---

[14]The actual calculation may be, and commonly is, made within the limits of a differential which section 1810.2 permits for convenience. (*Id,* subd. (d).)

use it and four major retailers who use the adjusted balance method. The ending balance method was employed to some extent in the earlier days of revolving credit, but it has declined in current usage. The average daily balance method has never been used by major retailers in this state.

The record and the briefs abound with arithmetical illustrations showing the comparative results which might befall a hypothetical customer of any store under each of the four methods of calculation described above, and with similar illustrations of the results experienced, in fact, by actual customers of the Alameda County defendants who have been billed for finance charges calculated under the previous balance method. The illustrations demonstrate, and the trial court found from substantial evidence in this regard, that the previous balance method generally produces finance charges which are higher in the aggregate than those which the adjusted balance method would produce, but lower in the aggregate than would result from either the ending balance or the average daily balance methods. One illustrative tabulation, which the trial court itself compiled and included among its findings, shows these comparative results in terms of the actual histories of the revolving accounts held by the individually named plaintiffs. With some editing which does not affect its substance, we reproduce this tabulation in the margin.[15]

The evidence further shows some specific experiences, or suggests the possibility of others, which would support the conclusion by any layman—or by a court, for that matter—that the use of the previous balance method may produce an inequitable result in a specific case involving a specific billing cycle. The most patent example might occur

[15]Column 3 of this tabulation shows the aggregate finance charges actually billed, under the previous balance method, to the plaintiff identified in column 1 during the period shown in column 2. Columns 4, 5 and 6 show what the same plaintiff's aggregate charges would have been, under each of the other three methods respectively, during the same period.

| 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| | Period of Account History | Actual Previous Balance Method | Ending Balance Method | Average Daily Balance Method | Adjusted Balance Method |
| Plaintiff # 1 | 7/70-12/71 | 76.57 | 84.63 | 83.25 | 65.28 |
| Plaintiff # 2 | 5/70- 9/71 | 7.70 | 12.59 | 13.63 | 2.88 |
| Plaintiff # 3 | 10/66-12/71 | 121.54 | 124.70 | 125.12 | 83.67 |
| Plaintiff # 4 | 11/65-12/71 | 286.96 | 291.85 | 295.20 | 259.57 |
| Plaintiff # 5 | 1/67-12/71 | 100.76 | 107.95 | 104.31 | 89.93 |
| Plaintiff # 6 | 10/70-12/71 | 33.00 | 42.45 | 40.22 | 30.52 |
| Plaintiff # 7 | 8/67- 7/71 | 456.62 | 497.02 | 510.96 | 439.68 |

when a hypothetical customer's statement for his current cycle shows a "previous balance" (also hypothetical) of $100. If he has paid $100 on his account during the current cycle, thus cancelling the previous balance shown, his statement for the cycle shows no finance charge. If he has paid most but not all of the $100 (e.g., $95), the statement bills him for $1.50 based upon the full $100. The record shows many variations of this hypothetical case to have occurred in fact, if in lesser degree and under differing circumstances; in all of these cases, the billing suggests that the customer was assessed for a *current* finance charge based upon an amount which he did not *currently* owe the store.

There is also evidence that some perceptive customers, reaching this conclusion, communicate with the store in attitudes ranging between irate protest and polite inquiry. When this occurs, the store will commonly make an adjustment to placate the customer. He will sometimes be credited with the full amount he claims as a credit, sometimes with part of it: in either event, the protested finance charge will be reduced. This is done in accordance with the details of a store-established policy in some instances, and on a case-by-case basis in others. Whatever the result, the effect of the procedure is to abandon the "previous balance" as the basis of the protested charge and to recompute the charge, according to the "adjusted balance method," in one way or another.

### The Pleadings and Procedural Sequence
### in the Alameda County Actions

In each of the Alameda County actions commenced against the background described above, the individual plaintiff alleged in the complaint that he or she was a member of a class composed of persons holding revolving accounts, as such accounts are defined in section 1802.7 (see fn. 7, *ante*), with the respective defendant named in the action; in effect, that the defendant employed the previous balance method in computing the finance charges billed to the various accounts each month; that it thereby violated the Unruh Act in that the monthly charge thus billed, and collected, in fact exceeded the "outstanding balance" actually owed the defendant by each member of the class when billed; and that each class member was therefore entitled to recover overcharges actually paid, and to an injunction restraining the defendant from continuing to employ the previous balance method. The defendants' answers pleaded material denials and multiple affirmative defenses which were addressed both to liability and to the propriety of the suits as class actions. In the pretrial conference order, as previously

indicated, the trial court separated these two subjects, defined the issues presented under each, and bifurcated the trial between the two subjects.

In stating the first of eight "issues" defined for resolution in the "liability" phase of the bifurcated trial, the court posed this question: "Does defendants' use of the previous balance method to compute finance charges on the named plaintiffs' retail installment accounts violate the Unruh Act?" Each of the other seven liability "issues" was framed on the premise that this question might be answered in the affirmative; they involved subsidiary questions such as what alternative method or methods of computing finance charges would *not* violate the Act, whether the plaintiffs were entitled to injunctive relief, and matters which had been placed in issue by some of the affirmative defenses raised in the various answers (e.g., the effect of statutes of limitations and the defenses of waiver and estoppel).

One significant action taken in the pretrial conference order should be specifically mentioned, at this point, because of its effect upon the several actions as pleaded. The order operated to transform the actions, which had been commenced for the recovery of money and for injunctive relief based upon the alleged illegality of the previous balance method under the Unruh Act, into actions for declaratory relief on the broad question of the method's legality as such. In effect, thus, the order produced declaratory relief actions where none had been explicitly pleaded; none of the complaints was amended so as to state an express cause of action for such relief by alleging an "actual controversy relating to the legal right and duties of the respective parties" as the basis for it. (See Code Civ. Proc., § 1060; 3 Witkin, Cal. Procedure (*op. cit. supra*) Pleading, §§ 708 [p. 2331], 718 [p. 2340].) The judgment which emerged (and which is hereinafter quoted) was unmistakably a declaratory judgment.

This transformation came about, however, with the concurrence and participation of the parties at the pretrial conference and later. Although the complaints sought the recovery of money and injunctive relief only, they necessarily challenged the validity of the previous balance method under the Unruh Act; as the issues were joined by the various answers, the existence of a "controversy" on this subject was made to appear. In any event, a pretrial conference order controls the subsequent course of an action even where it is inconsistent with the pleadings therein (4 Witkin, Cal. Procedure (*op. cit. supra*) Trial, § 66, pp. 2902-2903), and the present record clearly indicates that the liability phase of the consolidated actions was tried upon the theory that a declaratory judgment would result. (See *id.,* § 70, p. 2906.) For all these

reasons, the court properly tried the seven cases as actions for declaratory relief and properly entered a declaratory judgment.

### The Judgment

Upon the basis of its findings and conclusions, the trial court entered a declaratory judgment which stated in pertinent part that "1. Each defendant's use of the previous balance method to compute finance charges on retail installment accounts does not violate Civil Code Section 1810.2 or any other Section of the . . . [Unruh] . . . Act. 2. Plaintiffs, and each of them, shall take nothing by their respective complaints, and neither plaintiffs nor the classes they represent are entitled to injunctive or declaratory relief."

We have concluded that the trial court correctly declared that the previous balance method does not violate the Unruh Act; for the reasons next stated, we affirm the judgment.

### Discussion

Under all three methods actually used in the calculation of finance charges on revolving accounts in California, a closing balance is struck in an account at the end of a billing cycle: the methods differ only as to when and how that closing balance is used as the basis for calculating the charges. Under the ending balance method, a charge is computed on the closing balance, and billed to the customer with it, immediately. Under the previous balance method, the charge is computed on the same balance and at the same time, but its billing is deferred until the close of the next cycle; the statement for the next cycle (which by then is the "current cycle") bills the customer for the deferred finance charge and shows the balance by which it is calculated as the "previous balance." Under the adjusted balance method, the closing billing from the prior cycle is "adjusted" during the current cycle to show credits (but not debits) granted in the current cycle and the finance charge is computed on the adjusted figure (which is in effect a new closing balance, struck for the current cycle to show the sum of the customer's current credits).

One effect of the deferral feature of the previous balance method is to give the customer the option of avoiding the deferred finance charge entirely by paying his account in full before he is billed for the charge. Under this option, which is not available to him under the ending balance method, he may in effect elect to treat his revolving account as if

it were a 30-day account. The deferral feature of the previous balance method thus offers the customer an advantage which would appear to be a reasonable legislative objective in itself. Thus, the fact that the adjusted balance method may give more advantage to a given customer does not in itself compel the conclusion that the Legislature did not intend to permit use of the previous balance method as an alternative.

The disparity in *timing*, among the three methods, raises the question whether the Unruh Act requires the "balance," upon which the finance charge is calculated, to be struck at any particular point in time. This question focuses upon the full nine-word passage "computed on the outstanding balances from month to month," which is used in section 1810.2 (see fn. 8, *ante*) but none of whose terms is defined there or elsewhere in the Act.

In the ordinary sense of the term, the "outstanding balance" of any account is a net total shown to be owed when debits and credits in the account are compared. (See Webster's Third New Internat. Dict. (1967) p. 164 ["balance" 8 c]; cf. *Millet* v. *Bradbury* (1895) 109 Cal. 170, 173 [41 P. 865].) But the term can only be measured with reference to the particular point in time at which the comparison is made (i.e., when the balance is struck). Under the various methods of calculation employed in the *present situation*, the "outstanding balance" may be struck at the beginning of a cycle (under the previous balance method), at the close of a cycle (under the ending balance method or, subject to further adjustment for subsequent credits, under the adjusted balance method), or on an average daily basis during the cycle (under the average daily balance method). We therefore find nothing in the term "outstanding balance," as it appears in section 1810.2 and considered alone, which imports that the "outstanding balance" which is used in the calculation of finance charges must be struck at one particular point in time rather than another.

The question, then, is whether the next-conjoined words "from month to month" require the computation of a finance charge on the basis of an "outstanding balance" which is struck at some point in time other than at the commencement of the current billing cycle, as is done under the previous balance method. Plaintiffs contend that the conjoined words have this effect because they modify the term "outstanding balances"; under this interpretation and plaintiffs' argument, the basis for calculating the finance charge is the "outstanding balance[ ] from month to month," which must (according to the argument) reflect all current credits.

In our view, the words "from month to month" modify the verb "computed" and not the term "outstanding balances." This means that the full nine-word passage ("computed on the outstanding balances from month to month") requires no more than that finance charges be calculated on a balance which is shown to be "outstanding" as, and when, it is struck at consistent intervals which the words "from month to month" define as monthly; and that, since the previous balance method results in the calculation of charges on a balance (the "previous balance") as it appears at such intervals, and in uninterrupted progression "from month to month," the use of the method does not produce charges which exceed the ceiling fixed by section 1810.2.

The New York Court of Appeals reached this conclusion, upon similar reasoning, when presented with the same problems and a statute virtually identical to the Unruh Act in pertinent respects. (*Zachary* v. *R. H. Macy & Co., Inc.* (1972) 31 N.Y.2d 443 [340 N.Y.S.2d 908, 916-918, 293 N.E.2d 80]. Cf. *Federated Department Stores* v. *Pasco* (Fla.App. 1973) 275 So.2d 46, 50-51; *Johnson* v. *Sears Roebuck & Co.* (1973) 14 Ill.App.3d 838 [303 N.E.2d 627, 630-635].) As the New York court pointed out in *Zachary,* however, the statutory language itself produces a "battle . . . of words" which provide "no real answer" to the question whether the statute permits use of the previous balance method, and which require that the answer be found or confirmed in such other sources as the statute's legislative history. (*Zachary* v. *R. H. Macy & Co., Inc., supra,* at p. 918.)

The history of the Unruh Act, both before and since its original enactment in 1959 (Stats. 1959, ch. 201, § 1, p. 2092 et seq.), is replete with indications that the Legislature at all times has been aware of the previous balance method of calculating finance charges on revolving accounts, and has intended that the Act permit the method to be used in the retail trade. The Act was preceded by an intensive study of retail installment credit practices, conducted by the Subcommittee on Lending and Fiscal Agencies of The Assembly Interim Committee on Finance and Insurance between 1957 and 1959. The study produced a preliminary report by the subcommittee in March 1958. (10 Assem. Interim Com. Report No. 19 (1957-1959).) The preliminary report included a draft of the Act ("Proposed Bill"), which was introduced as Assembly Bill 500 at the 1959 Regular Session of the Legislature. The full Assembly committee filed a final report in March 1959 (*id.,* vol. 15, No. 22), which included and commented upon Assembly Bill 500 as introduced.

Although both of these reports concentrated on current abuses and

proposed reforms in the field of closed-end retail installment contracts rather than on revolving credit accounts, the latter subject was included in both reports as well as in Assembly Bill 500. The depth of the study as shown by the reports, and the details of the bill (which was promptly passed as the Unruh Act in 1959), clearly indicate that the subcommittee and the committee, and thus the 1959 Legislature as a body, were aware of the previous balance method when the Unruh Act was passed and approved by the Governor.

Speaking of section 1810.2 of the Unruh Act in its original form, the trial court found that the section "was drafted and enacted with full knowledge of the widespread and prevailing use of the previous balance method, and its language was conceived as being descriptive, not prohibitive, of the computational methods then in use throughout California. The Legislative history indicates no intention to require exclusive use of the adjusted balance method." This finding is fully supported by the abovementioned 1958 and 1959 reports, both of which were received in evidence together with the full transcript of the subcommittee's principal hearing conducted in August 1958.

Following the effective date of the Act (Jan. 1, 1960, as provided therein: see Stats. 1959, ch. 201, § 2, p. 2108), the vast majority of retailers offering revolving accounts in California continued to use the previous balance method in computing finance charges on the accounts. Commencing in 1963, and at every legislative session to and including 1972, bills were introduced for the explicit purpose of prohibiting the use of the previous balance method. None of these bills (all or most of which were received in evidence) was adopted, and the original form of none of them reached the floor in either house of the Legislature.

One such bill, introduced in 1963, was referred to the Assembly Interim Committee on Finance and Insurance for study. The committee conducted hearings and filed a report on the 1963 bill in January, 1965. (15 Assem. Interim Com. Report No. 27 (1963-1965).) The 1965 report was received in evidence. Concerning its contents and the interim study reported by it, the trial court found as follows:

"The Committee heard and discussed the same types of complaints about the previous balance method which plaintiffs have made in this case. In its Report, issued in January, 1965, the Committee acknowledged that § 1810.2 does not prescribe exclusive use of one method for determining the base to which the authorized finance charge rates are applied. It said that complaints about the operation of the previous balance method involve infrequent situations, and that the amounts

involved are small. The Interim Committee concluded that consumer protection would best be served, not by changing the law to require exclusive use of one computational method, but rather, by enactment of a provision requiring disclosure of the method of determining the balance on which the finance charge is computed. Following the Interim Committee's recommendation, the Legislature in 1965 enacted an amendment to § 1810.1 requiring printed disclosure describing the balance on which the finance charge is computed."

This finding is fully supported by the Assembly committee's 1965 report. The 1965 legislation amended both sections 1810.1 and 1810.2 to require a retailer to give to the prospective holder of a revolving account a statement "describing the balance on which . . . [the finance] . . . charge will be computed," and informing him that he "may at any time pay his entire balance." (Stats. 1965, ch. 1529, §§ 1 [p. 3622], 2 [p. 3623].)

In the ordinary situation requiring interpretation of a statute, the "unpassed bills of later legislative sessions" are regarded as of "little value" in determining the legislative intent underlying the original enactment. (*Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41, 57-58 [69 Cal.Rptr. 480].) We reach a contrary conclusion here because of the full context of circumstances in which the Legislature failed to enact any of the bills involved, including the pre-enactment history of the Unruh Act as recorded and described above, the specific study of the problem which produced the 1965 committee report, and the action actually taken by the Legislature in 1965. In our view, the totality of these circumstances indicates that the Legislature intended that the Unruh Act permit the use of the previous balance method when, and at all times since, it was enacted in 1959.

This conclusion is further supported by language appearing in other provisions of the Act itself. Section 1810.1 requires a retailer to disclose to a revolving account customer, in writing when the account is opened (and among other things), "[t]he method of determining the balance upon which a finance charge may be imposed." (§ 1810.1, subd. (b); see the full text of the section as quoted in fn. 10, *ante.*) This language clearly recognizes that more than one method may be used in calculating the charge and that, contrary to plaintiffs' arguments, no single method need be used exclusively.

Section 1810.3 (the full text of which is quoted in fn. 11, *ante*) requires that the statement rendered for each billing cycle of a revolving account show the customer, among other things, "[t]he outstanding balance in the account at the beginning of the billing cycle, using the term *previous*

*balance'* " *(id.,* subd. (a)(1) [italics added]), and the items of debits and credits occurring in the cycle. *(Ibid.,* subds. (2), (3).) More important, the statement must show "[t]he balance on which the finance charge was computed," "how that balance was determined," and "[i]f any balance is determined without first deducting all credits during the billing cycle, that fact and the amount of such credits shall also be disclosed." *(Ibid.,* subd. (6).) This language, which was incorporated into the Act in 1969 (Stats. 1969, ch. 625 [p. 1264], § 17 [pp. 1270-1271]) is unmistakably addressed to the previous balance method alone; it is accordingly irreconcilable with the plaintiffs' contention that the Act prohibits the use of that method.

The plaintiffs dispute this last conclusion because the 1969 enactment included a statement that it was intended to conform the Unruh Act with regulations promulgated under the Federal Truth in Lending Act (15 U.S.C. § 1601 et seq.), but that "it is not the intent of the Legislature . . . to change existing state law with respect to the regulation of finance charges and rates." (Stats. 1969, ch. 625, § 24, p. 1273.) The 1969 statement of intent must be examined in the full context of the Act's history, as previously recounted herein, and with some of the language of the 1969 amendment itself (e.g., the reference in section 1810.3 to the use of the express term "previous balance" on the monthly statement, which term does not appear in the parallel provision of the Truth in Lending Act: see 15 U.S.C. § 1637 (b) (1)). Read in light of these factors, the Legislature's expression of intent in the 1969 enactment must be interpreted as (1) an acknowledgment that use of the previous balance method was permitted under the "existing state law" which the 1969 Legislature did not intend to change, and (2) a declaration that the Unruh Act permitted the continuing use of the method, but in strict conformity with federal law.

In the 1958 preliminary committee report previously cited, the Assembly subcommittee made a passing reference to "1-½ percent per month," to be charged on revolving accounts in the then-proposed legislation, as "a true interest rate of 18 percent per annum." This language has prompted the plaintiffs to insist that the Unruh Act therefore prescribes a "true" finance charge rate of "18 percent per annum," and that it thereby prohibits use of the previous balance method because that method commonly produces an annual "yield" in excess of 18 percent from a typical revolving account. Again drawing upon the full legislative history of the Act, and after exhaustive discussion of the conceptual distinction between "true rates" and "nominal rates," the trial court concluded that the monthly rates specified in section 1810.2 were "nominal," and that the annual "yield"

they produced did not exceed an absolute ceiling which would be established by a "true" annual rate (which is nowhere expressed in the Act). The trial court also compared the actual "yield" derived from finance charges on revolving accounts with the precomputed finance charges assessed on closed-end "retail installment contracts," and found them to be within the range of an approximate parity which the 1958 and 1959 reports expressed as one of the objectives of the Unruh Act. The trial court's findings and conclusions in these respects were correct.

A pervasive theme in the Alameda County plaintiffs' exhaustive briefs is that the Unruh Act must be liberally construed in favor of the consumers it is designed to protect; and that this rule requires us to construe the Act as permitting the adjusted balance method only, to the exclusion of all others, because that method produces the lowest consumer cost. Although it is clear that the Act should be liberally construed in favor of the retail consumer (*Morgan* v. *Reasor Corp.* (1968) 69 Cal.2d 881, 889 [73 Cal.Rptr. 398, 447 P.2d 638]), we may not construe it in terms which its history and language do not permit. (Code Civ. Proc., § 1858.)

It is *not* clear, moreover, that these plaintiffs' objective would produce the consumer benefits claimed for it. The adjusted balance method of calculating finance charges is merely one of several formulas which have developed in the retail trade, and the variety of such methods demonstrates that the field is flexible and that the various formulas are subject to innovative change. Whether or not any such specific change would be permitted by the Unruh Act is only a matter of speculation, but we are by no means persuaded that a choice of the adjusted balance method, to the exclusion of the other methods presently available, would permanently favor the affected consumers as these plaintiffs contend. Stated another way, the Alameda County plaintiffs propose to win a battle but could very well lose the war. The rule which mandates liberal construction of the Unruh Act does not impose this risk upon us; the proper battlefield is in the Legislature.

For all of the foregoing reasons, and for others which arise from the voluminous briefs but which need not be discussed, the single judgment in 1 Civil 33020 must be affirmed.

*1 Civil 31184, 31804, 31811 and 31812*

As previously stated, these four appeals are from judgments which dismissed each of the San Francisco actions after a general demurrer to

the complaint therein had been sustained without leave to amend. As was true in the Alameda County actions, each of the San Francisco complaints purported to maintain a class action upon a stated cause of action for the recovery of overcharges paid on revolving accounts after having been calculated under the previous balance method which, according to each complaint, was illegal under the Unruh Act. The San Francisco appeals thus present the identical question of law resolved in the foregoing discussion of the appeal in the Alameda County actions. For the reasons there stated, none of the San Francisco complaints stated a cause of action; each of the judgments of dismissal must therefore be affirmed.

These appeals present one additional point because, in each of , the San Francisco actions, the trial court assessed the plaintiff with attorneys' fees as claimed by the defendant in a cost bill. The San Francisco plaintiffs contend that this action was invalid and that the amounts charged were excessive.

The assessment of attorneys' fees was valid pursuant to section 1811.1, which provides in pertinent part that "[r]easonable attorney's fees and costs *shall* be awarded *to the prevailing party* in any action on a contract or installment account [i.e., revolving account] subject to the provisions of . . . [the Unruh Act] . . . regardless of whether such action is instituted by the seller, holder or buyer." Each of the San Francisco actions was "instituted" by a "buyer" (see fn. 5, *ante*); in each, the defendant was the "prevailing party." Each action was also an "action on . . . [an] . . . installment account" within the meaning of section 1811.1 (*Morgan* v. *Reasor Corp., supra,* 69 Cal.2d 881 at p. 896.)

The San Francisco plaintiffs' contention that the fees actually awarded were excessive is based upon the stated premise that the amounts which the individually named plaintiffs actually sought to recover were relatively small. However, this does not appear in the records on the San Francisco appeals; moreover, each of the complaints confronted the respective defendant with a class action of prospectively huge proportions. Each award of attorneys' fees was supported by a sworn declaration to the effect that the amounts claimed were reasonable. Under the circumstances, there is no occasion to disturb the trial court's exercise of discretion in this regard.

In 1 Civil 33020, the judgment is affirmed. All other appeals purportedly taken in the notice of appeal therein are dismissed. In 1

Civil 31184, 31804, 31811 and 31812, the judgments of dismissal are affirmed.

Christian, J., and Emerson, J.,* concurred.

Petitions for a rehearing were denied February 28, 1975, and appellants' petition for a hearing by the Supreme Court was denied April 16, 1975. Tobriner, J., and Sullivan, J., did not participate therein. Mosk, J., was of the opinion that the petition should be granted.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.