TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL

State of California

JOHN K. VAN DE KAMP

Attorney General

------------------------------
:
OPINION           :
:
of        :  No. 87-1003
:
JOHN K. VAN DE KAMP    :  <u>DECEMBER 1, 1987</u>
Attorney General    :
:
JACK R. WINKLER    :
Assistant Attorney General    :
:
----------------------------------------------------------------

THE HONORABLE CHARLES M. CALDERON, MEMBER OF THE CALIFORNIA ASSEMBLY, has requested an opinion on the following question:

Does the reduction in the maximum finance charge which may be applied to outstanding balances on retail installment accounts under Civil Code section 1810.2 which will occur on January 1, 1988 apply to those parts of such outstanding balances which were incurred for purchases made prior to January 1, 1988?

CONCLUSION

The reduction in the maximum finance charge which may be applied to outstanding balances on retail installment accounts under Civil Code section 1810.2 which will occur on January 1, 1988 does apply to those parts of such outstanding balances which were incurred for purchases made prior to January 1, 1988.

ANALYSIS

I. The Unruh Act.

The Unruh Act[1] (Civ. Code § 1801 et seq.) was first enacted in 1959 to regulate certain practices in the field of retail installment sales of consumer goods and services. Retail installment accounts are governed by article 10 of the Unruh Act commencing with section 1810.1[2] et seq. Key provisions of sections 1802.7, 1810.1, 1810.2, 1810.3 and 1810.9 are quoted in the Appendix.

Section 1802.7 defines a retail installment account as "an account established by an agreement . . . pursuant to which the buyer promises to pay, in installments, to a retail seller, his outstanding balance incurred in retail installment sales, . . . which provides for a finance charge which is expressed as a percent of the periodic balances to accrue thereafter . . . ." Before the first transaction is made on such an account the seller must "disclose to the buyer in a single written statement" certain terms of the agreement including the finance charges and the method of computing the periodic balances[3] on which the finance charges are computed. (§ 1810.1.) Section 1810.2 establishes limits on the rates of the finance charge which may be imposed. Section 1810.3 prescribes the contents of the periodic (usually monthly) statements which must be sent to the buyer. Section 1810.3(d) also provides that if any change is to be made in the terms of the agreement for a retail installment account the seller must give the buyer 30 days prior written notice of such changes.

The question presented is concerned with the limits imposed by the Unruh Act upon finance charges on retail installment accounts. Section 1810.4 of the original Unruh Act (Ch. 201, Stats. 1959) fixed the limit at 1.5 percent of an outstanding balance not exceeding $1,000 and 1 percent of the balance over that amount. Chapter 625, Statutes of 1969 renumbered the same section

---

[1]The legislative history of the Unruh Act is set forth in a Preliminary Report and a Final Report of the Subcommittee on Lending and Fiscal Agencies of the Assembly Interim Committee on Finance and Insurance published with the Assembly Interim Committee Reports for 1957-1959, volume 15, numbers 19 and 22 in the Appendix to the Assembly Journal. A 1971 article entitled "The Unruh Act: A Legislative History" appears in volume 4 of the University of California, Davis Law Review at page 1.

[2]Section references are to the Civil Code unless otherwise indicated.

[3]In Seibert v. Sears, Roebuck & Co. (1975) 45 Cal.App.3d 1, 10-11, the court described four different methods of computing the monthly outstanding balances on retail installment accounts, namely (1) The Previous Balance Method, (2) The Adjusted Balance Method, (3) The Ending Balance Method and (4) The Average Daily Balance Method. The court held that use of the Previous Balance Method did not violate the Unruh Act and stated (on p. 19) that section 1810.1(b) recognizes that more than one method may be used to determine the outstanding balance on which the finance charge is to be computed.

1810.2 but kept the same limits. The amendment of section 1810.2 by chapter 546, Statutes of 1970 did not change the limit and it remained unchanged until 1979.

The amendments of section 1810.2 commencing with chapter 1381, Statutes of 1979 and those since each contained two versions of that section, the first providing a higher limit on the finance charge with a sunset clause repealing that version on a specified date, and the second version providing the old limits operative on the same specified date.[4]

The latest statute to amend section 1810.2 is chapter 227, Statutes of 1985.[5] (See full text of both versions in the Appendix.) Only one version of section 1810.2 is law at any time, the SEC. 3 version until January 1, 1988 and the SEC. 4 version thereafter by virtue of the final sentences in each version. The only other differences in the two versions are in subdivisions (a) and (b) which make two changes, namely the percentage is reduced from 1.6 to 1.5 percent and the amount to which that percentage is applied is reduced from $3,000 to $1,000. The effect of the changes is to make those two reductions effective on January 1, 1988. We are asked whether these reductions in maximum finance charge apply to those parts of the outstanding balances which were incurred for purchases made prior to January 1, 1988.

II. Interpretation of Section 1810.2

In construing section 1810.2 we follow the rules of statutory construction announced by the courts. The principal rules were summarized in Moyer v. Workmen's Comp. Appeals Bd. (1973) 10 Cal.3d 222, 230 as follows:

---

[4]Chapter 1381, Statutes of 1979 raised the limit to 1.6 percent on outstanding balances up to $1,000 in its first version of section 1810.2 with a sunset provision repealing that version March 31, 1982 and the second version with the old 1.5 percent limit was made operative on the same date. Chapter 26, Statutes of 1981 extended the sunset repeal of the 1.6 percent limit to October 1, 1982. Chapter 1611, Statutes of 1982, increased the limit to 1.6 percent of the outstanding balance not over $3,000 in its first version of section 1810.2 with a sunset clause repealing that version on January 1, 1984 and made the second version of that section with the old limits of 1.5 percent on outstanding balance not exceeding $1,000 operative that same date. Chapter 1157, Statutes of 1983, extended the sunset repeal of the 1.6 percent limit on the first $3,000 of the outstanding balance and the operative date of the 1.5 percent on the first $1,000 version of section 1810.2 to January 1, 1986. The latest amendments of section 1810.2 were enacted by chapter 227, Statutes of 1985 both versions of which are quoted in full in the Appendix.

[5]Assembly Bill 2575 (1987) which would have extended the sunset clause repeal date to January 1, 1991 in the current version of section 1810.2 and make a second version of that section restoring the 1.5 percent limit on outstanding balances not exceeding $1,000 operative on the same date was vetoed by the Governor on September 22, 1987.

"We begin with the fundamental rule that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent the court turns first to the words themselves for the answer. We are required to give effect to statutes according to the usual, ordinary import of the language employed in framing them. If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose; a construction making some words surplusage is to be avoided. When used in a statute words must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear. Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole." (Citations and quotations omitted.)

The key words of limitation in the version of section 1810.2 which will become operative on January 1, 1988 are:

". . . The finance charge shall not exceed the following rates computed on the outstanding balances from month to month: (a) On so much of the outstanding balance as does not exceed one thousand dollars ($1,000), 1 1/2 percent. . . ."

We see nothing in the wording of this statute to suggest that when the Legislature used the words "outstanding balance" in subdivision (a) it did not mean all of the outstanding balance for the particular month in question. The continuing nature of agreements for retail installment accounts and their focus on the monthly balance as the basis for computing monthly payments and finance charges reinforces the idea that the Legislature had the entire balance in mind when it enacted section 1810.2. No one has suggested that anything less than all of the monthly balance be used to compute the monthly payment.

In looking to the wording of section 1810.2 we see from subdivision (a) that the 1.6 percent is to be applied "[o]n so much of the outstanding balance as does not exceed three thousand dollars" until January 1, 1988 and the 1.5 percent is to be applied "[o]n so much of the outstanding balance as does not exceed one thousand dollars" after January 1, 1988. Thus section 1810.2 contemplates that the computation of the finance charge requires a division of the outstanding balance into two categories, namely the amount of the balance up to $3,000 or $1,000 and the amount of the balance over those amounts. The question suggests there may be another division of the outstanding balances necessary to compute finance charges after January 1, 1988, namely a division between that part of the outstanding balance incurred from purchases made before January 1, 1988 and that part of the outstanding balance incurred from purchases made after that date. Our search of the language of both versions of section 1810.2 revealed no hint of any need to divide the outstanding balances on the basis of the dates purchases were made in computing the finance charge. Section 1810.2 speaks of "the outstanding balance" in the singular indicating there is only one outstanding balance on which the finance charge is to be computed.

We believe the plain meaning of the language used in section 1810.2 manifests a legislative intention that the maximum rate of 1.5 percent was to be applied to the first $1,000 of the

entire outstanding balance computed after January 1, 1988 and that the maximum rate on any amount of the outstanding balance over $1,000 is 1 percent.

Section 1810.9 provides that nothing in the article governing retail installment accounts is to be construed to affect the validity of any agreement made prior to January 1, 1960 when the Unruh Act first went into effect "except that any rate in excess of that allowed by this article shall be reduced to the permissible rate on or before January 1, 1960." While section 1810.9 applies only to agreements made before 1960 it clearly expresses the Legislature's intention that the limits on the rates of finance charges were meant to apply to the balances of existing retail installment accounts in computing the finance charges on such accounts after the effective date of the law imposing such limits. Our interpretation of section 1810.2 and its application to agreements for retail installment accounts made after January 1, 1960 is consistent with the legislative intent expressed in section 1810.9.

In Morgan v. Reasor Corp. (1968) 69 Cal.2d 881, 897-898, the Supreme Court observed:

"The Unruh Act represents a constructive effort by the Legislature to protect consumers in the State of California in the all-important area of installment contracts. In interpreting the act we must seek the achievement of the legislative purpose of according to consumers who are parties to such contracts the full protection of the salutary statute."

On page 889 the court stated that "the act should be liberally construed so as to protect consumers." In King v. Central Bank (1977) 18 Cal.3d 840, 844-845 the court made reference to the Morgan case as follows:

"Initially, we note that a 1959 opinion of the California Attorney General had concluded that a loan to finance payment of insurance premiums was not a 'service' under section 1802.2. (34 Ops.Cal.Atty.Gen. 288, 289 (1959).) While that opinion is entitled to 'great respect' (Wenke v. Hitchcock (1972) 6 Cal.3d 746, 751-752), it is noteworthy that the opinion did not focus upon, indeed ignored, the language of section 1802.2 which defines 'services' as including, specifically, 'services furnished in connection with    . . . the providing of insurance, . . .'  Instead, the opinion emphasized that the Unruh Act was intended to apply only to transactions involving a retail installment contract executed between retail buyers and sellers. We are persuaded, however, by reason of the act's interlocking definitions of 'retail installment contract,' 'seller,' and 'services,' mentioned above, that it is at least arguable that an agreement to finance an automobile insurance policy through installment payments constitutes a 'service' transaction covered by the act. As we stated in Morgan v. Reasor Corp., supra, 69 Cal.2d 881, in rejecting an attempt to construe narrowly the act's definition of 'services': 'Section 1802.2 clearly includes all services provided for personal purposes, except for the specifically enumerated exceptions [not applicable here]; obviously we do not assume that the Legislature

intended exceptions other than those it explicitly specified.' (P. 888, italics added by court.)"

We believe our interpretation of Section 1810.2 follows the precepts of statutory construction announced and followed in the Morgan and King cases.

Chapter 26, Statutes of 1981 amended section 1810.2 in a manner similar to that set forth in section 3 and 4 of chapter 227, Statutes of 1985, quoted in the Appendix. Two versions were adopted, the first with a sunset clause repealing it October 1, 1982 and the second to become operative on that date. The second version was identical to that set forth in SEC. 4 of chapter 227 except for the operative date. The first version was identical to that set forth in SEC. 3 of chapter 227 (through subd. (d)) except that the amounts in subdivisions (a) and (b) were $1,000 instead of $3,000. In addition the first version contained a subdivision (e) which read as follows:

"(e) If a seller or holder of a retail installment account increases its finance charge rate, then the increased rate may only be applied to balances consisting of purchases or other charges incurred on or after the effective date of the increase. For purposes of determining the balances to which the increased rate applies, all payments and other credits may be deemed to be applied to the balance existing prior to the change in rate until that balance is paid in full."

Thus when the Legislature wanted the computation of finance charges to be based on different rates applied to purchases made before and after a particular date it provided express language in the statute to achieve that end. The second version of section 1810.2 in said chapter 26 did not contain the subdivision (e) provision quoted above nor did any subsequent version of section 1810.2 contain such a provision. "Where the Legislature omits a particular provision in a later enactment related to the same subject matter, such deliberate omission indicates a different intention which may not be supplanted in the process of judicial construction." (Kaiser Steel Corp. v. County of Solano (1979) 90 Cal.App.3d 662, 667.) This rule of construction reinforces our earlier interpretation that section 1810.2 does not require the division of the outstanding balance to compute finance charges after January 1, 1988 on the basis of purchases made before and after that date.

We are mindful of the rule of construction that statutes are presumed to operate prospectively and not retroactively in the absence of contrary indications of legislative intent. (See In re Marriage of Bouquet (1976) 16 Cal.3d 583, 586-587.) We note first that the sunset repeal of the l.6 percent limit on January 1, 1988 does not apply the old l.5 percent limit retroactively. The 1.5 percent limit is applied only to those outstanding balances computed after January 1, 1988, the operative date of the second version of section 1810.2. Thus the reduced limit is not applied retroactively to finance charges imposed prior to its effective date. It may be argued that since the outstanding balances computed after January 1, 1988 arise, at least in part, from purchases made prior to that date the reduced limit is in a sense being applied retroactively to such prior purchases. However, when such prior purchases were made both parties were aware of the fact that the 1.6 percent limit was only temporary and that on the sunset repeal date the finance charge limit would revert to 1.5 percent on outstanding balances not exceeding $1,000. Thus we believe not only that

the application of the reduced limit to the entire outstanding balance in computing finance charges after January 1, 1988 was intended by the Legislature but that was the understanding of the parties as well.

III.  The Agreement for a Retail Installment Account

The courts have examined the legal nature of retail installment accounts in California in some detail.  In Seibert v. Sears, Roebuck & Co. (1975) 45 Cal.App.3d 1 the court described two retail installment credit arrangements used in California.  After describing the retail installment contract in which each purchase is the subject of a new contract or added to an existing contract the court described the retail installment account as follows (at pp. 7-8):

"The other credit arrangement offered is the so-called 'revolving charge account,' which is the subject of all of the present actions and which is denominated 'retail installment account' or 'installment account' or 'revolving account' in section 1802.7, which also defines it and its terms.  The revolving account is established by a single agreement between the store and the customer without a down payment by the latter, and it operates so as to permit the customer to make continuing credit purchases from time to time without having to enter into a new contract, or contract revision, on the occasion of each new credit purchase.  The agreement provides for minimum monthly installment payments, but the customer is given the option to make payments in excess of the minimum monthly amount at any time.

"The revolving account also carries a 'finance charge' as defined in section 1802.10, but the Unruh Act does not require its precomputation as in the case of a closed-end contract; instead, it is periodically calculated on the basis of monthly 'balances' as provided in section 1810.2.  Such 'balances' are billed to the customer on statements which are sent to him after the close of his monthly 'billing cycle,' a time period which is defined in section 1802.17.  Section 1810.1 requires a written disclosure to the customer, covering these matters and others, at the inception of any revolving account.  The contents of each monthly statement are prescribed in section 1810.3.  Because of its convenience, the revolving account has largely replaced the 'closed-end contract' arrangement in this state." [Footnotes and footnote references were deleted.]

To answer the question presented we must analyze the rights and obligation of the parties to a retail installment account as revealed by their agreement and the law governing such agreements, the Unruh Act.  Section 1802.7 provides that a retail installment account is established by an agreement between a retail seller and a buyer.  Section 1810.1 provides that before the first transaction is made on any retail installment account the seller shall disclose to the buyer in a single written statement:

(a) When a finance charge may be imposed.

(b) How balances used to fix finance charges are computed.

(c) How the finance charge is determined, and minimums.

(d) How different rates are used to compute finance charges.

(e) How other charges may be imposed.

(f) If and how the seller has a security interest.

(g) The minimum periodic payment required.

Typically an application for a retail installment account contains a form agreement to which the buyer agrees when he or she signs the application. This agreement sets forth the terms of the retail installment account agreed upon by the parties which usually includes the matters which the seller must disclose to the seller under section 1810.1 outlined above. Such agreements often provide that the seller may change the terms of the agreement, including finance charge rates, upon prior notice to the buyer to the extent permitted by law.

As the Seibert case points out the agreement for a retail installment account has little in common with the traditional installment sale in which certain goods or services (such as an appliance and its installation) and finance charges are to be paid in installments all of the terms of which are specified in a written contract. In the traditional installment sale contract all the terms are fixed at the time of the sale and are specified in the contract. In sharp contrast the agreement for a retail installment account must be completed before the first transaction is made and thus does not apply to any particular property or services. It contemplates that the property and services covered by the agreement will change as the buyer makes purchases and payments on the account. Also in sharp contrast is the fact that the terms of most agreements for retail installment accounts are not fixed but instead provide that the seller may change any of its terms by giving the buyer prior notice of such changes subject to the requirements of law. Conceptually the traditional installment sale contract involves a single transaction for the purchase of goods or services in installments the terms of which are fixed for all time when the contract is made while the agreement for a retail installment account sets up a continually evolving procedure by which unknown future purchases may be paid for in installments upon agreed terms which may themselves be changed as the agreement continues.

A central feature of the continuing agreement for a retail installment account is the computation of a monthly (or other period) balance in the account. This balance changes from month to month as new purchases and finance charges are added and payments are deducted from the prior month's balance. This balance is significant because it is the amount by which the agreed rate is multiplied to determine the finance charge which is added to the account. It is also used to determine the amount of the monthly payment to be made by the buyer. (§ 1810.1(g) requires the agreement to specify the minimum periodic payment required and this is usually expressed as a fraction or   percentage of the balance or by the use of a table or formula applied to the balance.) Section 1810.1(b) requires that the method of determining the balance on which the finance charge

is computed be spelled out in the agreement. Thus it is the monthly balances which are the bases for determining monthly payments and the finance charges under agreements for retail installment accounts, not the purchase price for particular goods or services as in traditional installment sales contracts.

When the agreement for a retail installment account specifies a finance charge of 1.6 percent of the outstanding balance not exceeding $3,000 and 1 percent above that amount without stating what occurs if and when the law reduces those limits the agreement becomes ambiguous in that event and requires interpretation. "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." Civil Code section 1643. All applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated. (Alpha Beta Food Markets v. Retail Clerks (1955) 45 Cal.2d 764, 771; Grubb v. Ranger Ins. Co. (1978) 77 Cal.App.3d 526, 529.) Applying this general rule in Hischemoeller v. Nat. Ice etc. Storage Co. (1956) 46 Cal.2d 318, 325 the court held that the rates and regulations issued by the Public Utilities Commission automatically became implied terms of any contract made between a public utility and its customer. We believe a court would apply these rules to resolve the ambiguity in the agreement for a retail installment account referred above by interpreting the stated percentages used to compute the finance charge to apply only for such time as such rates are lawful and when the law reduces the maximum rates the rates to be used to compute finance charges under that agreement are the reduced maximum rates after the time the reduced maximum rates become effective.

IV. The Constitutionality of Section 1810.2.

Next we consider the constitutional validity of section 1810.2 as we have construed it. Article I, section 9 of the California Constitution and article I, section 10, clause 1 of the United States Constitution prohibit the passage of any ex post facto law. An ex post facto law is one which operates retrospectively to make conduct criminal which was lawful when the conduct was performed. (People v. Benefield (1977) 67 Cal.App.3d 51.) Since section 1812.6 makes willful violations of the Unruh Act misdemeanors we must consider whether the version of section 1810.2 which will become operative on January 1, 1988 will operate as an ex post facto law. We have already noted that the new version of section 1810.2 will apply the 1.5 percent limit on finance charges only to those retail installment account balances which are outstanding from month to month after January 1, 1988, the operative date of the statute. Thus the statute will not make criminal conduct which occurred before its operative date. We conclude that the version of section 1810.2 which will become operative on January 1, 1988 will not operate as an ex post facto law in violation of article I, section 9 of the California Constitution or article I, section 10, clause l of the United States Constitution.

In Fox v. Federated Department Stores, Inc. (1979) 94 Cal.App.3d 867 the validity of the maximum finance charges on retail installment accounts provided in section 1810.2 of the Unruh Act was challenged on the ground that it allowed interest charges greater that those allowed

by article XV of the California Constitution on usury. The court held that the finance charges on retail installment accounts were credit prices on bona fide sales transactions within the "time-price" doctrine and not interest on a loan or forbearance of money within the meaning of article XV. We conclude that the Unruh Act does not violate article XV of the California Constitution on usury.

It has been suggested that applying the 1.5 percent limit after January 1, 1988 to those parts of the outstanding balance incurred from sales made before that date when 1.6 percent was lawfully charged would impair the obligation of contract in violation of article I, section 9 of the California Constitution or article I, section 10, clause 1 of the United States Constitution and deprive persons of vested rights in violation of the due process clauses in article I, section 7 of the California Constitution and the Fourteenth Amendment of the United States Constitution. The simple answer to this suggestion is that an agreement for a retail installment account does not obligate or provide vested rights to a particular finance charge rate in the future since the agreement itself is subject to change and such rates are subject to the limits fixed by law.

The obligation of a contract is the law which binds the parties to perform their agreement. The laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. (Brown v. Ferdon (1936) 5 Cal.2d 226, 230.) In considering the obligation of the contract for a retail installment account the statute limiting the finance charges which may be made, i.e. section 1810.2 becomes part and parcel of the obligation of such contract. This includes both versions of that section as they have been enacted and revised from time to time by the Legislature. The versions of section 1810.2 which have allowed a 1.6 percent finance charge on outstanding balances not exceeding $3,000 have all contained sunset clauses providing for their repeal on a certain future date at which time the permanent version of section 1810.2 with its 1.5 percent limit on outstanding balances not exceeding $1,000 would become operative. The obligation of those contracts for retail installment accounts which provided for 1.6 percent of the first $3,000 has never provided that such rate could be charged after January 1, 1988. Thus applying the 1.5 percent limit on the first $1,000 of outstanding balance of retail installment contracts which will become operative on January 1, 1988 will not impair the obligation of those contracts.

Similarly, the sunset clauses which have always been contained in those versions of section 1810.2 containing the 1.6 percent limit on the first $3,000 of outstanding balance has prevented the vesting of any right to charge the increased limit beyond the date fixed by the sunset clauses for the repeal of such increased limit.

The constitutional prohibition against contract impairment does not exact a rigidly literal fulfillment; rather, it demands that contracts be enforced according to their just and reasonable purport; not only is the existing law read into contracts in order to fix their obligations, but the reservation of the essential attributes of continuing governmental power is also read into contracts as a postulate of the legal order. (Home Building & Loan Assn. v. Blaisdell (1933) 290 U. S. 398; City of El Paso v. Simmons (1965) 379 U.S. 497, 508; Lyon v. Flournoy (1969) 271 Cal.App.2d 774, 782.) On this basis the courts hold that all contracts are made subject to laws enacted under a proper exercise of the police power though the legislature cannot, under the guise of the police

power enact a measure which impairs the obligation of contract. (<u>Castleman</u> v. <u>Scudder</u> (1947) 81 Cal.App.2d 737, 739-740.)

The determination whether a statute constitutes a taking of property without due process or an impairment of the obligation of a contract or constitutes an exercise of that residuary power of the state to protect the health, safety, and morals of its inhabitants known as the police power, consists in balancing the burden placed on the individual or corporation on the one hand against the benefit which will accrue to the public as a whole on the other. If the benefit to the public outweighs the burden on the individual, the statute is a valid exercise of the police power. (<u>State of California</u> v. <u>Marin Municipal Water District</u> (1941) 17 Cal.2d 699, 706.)

It is well settled that the Legislature may regulate the conduct of business in the exercise of its police power. The Legislature may restrict or prohibit trade practices which upon reasonable grounds it determines are predatory, vicious, unfair and anti-social though such legislation has the result of modifying or revoking contracts already in effect. The fundamental query to be determined is not whether a contract is affected incidentally or directly by the statute but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end. (<u>Castleman</u> v. <u>Scudder</u>, <u>supra</u>, at p. 740.) These principles were applied to uphold the constitutionality of a statute enacted under the state's police power during the emergency caused by the great depression which imposed a 4 percent limit on the interest accruing on all outstanding savings and loans certificates, including those at issue in the case which specified a 6 percent interest rate. (<u>State Bonded Audit Bureau, Inc.</u> v. <u>Pomona Mutual Building and Loan Assn.</u> (1940) 37 Cal.App.2d (Supp.) 765.)

In <u>King</u> v. <u>Central Bank</u> (1977) 18 Cal.3d 840, 843-844, the court stated that the Unruh "act proscribes a variety of unfair practices such as the unauthorized alteration of retail installment contracts, the assessment of excessive finance charges, inadequate disclosure of information to consumers, and unfair garnishment and repossession practices." We believe the courts would hold that the Unruh Act is a police power measure in which the benefits to the general public outweigh the burden on individuals and is therefore a valid exercise of the police power though it has the effect of modifying existing contracts. Thus even if we are wrong in our conclusion that agreements for retail installment contracts do not create obligations or vested rights to charge the 1.6 percent rate on the first $3,000 for finance charges computed after January 1, 1988, we nevertheless conclude that the change in Section 1810.2 which will occur on January 1, 1988 will limit that rate to 1.5 percent on amounts not exceeding $1,000 and 1 percent on amounts exceeding $1,000 in all agreements for retail installment accounts. For the reasons stated we believe that this reduction in the limit is a constitutional exercise of the police power.

V. <u>Summary</u>

The plain meaning of the language used in section 1810.2, the expressed intent in section 1810.9 to apply the finance charge limits to existing agreements for retail installment accounts and the rules of statutory construction all lead to the conclusion that the Legislature intended the finance charge limits in section 1810.2 to apply to the entire outstanding balance in a

such accounts when the limits become operative. We found nothing in our research which remotely suggests that the Legislature intended that the outstanding balances in retail installment accounts are to be bifurcated on the basis of sales made before and after the operative date of a statute reducing the rates used to compute finance charges.

The limits on finance charges on retail installment accounts originally imposed by the Unruh Act were expressly made applicable to retail installment accounts made before the Unruh Act became effective by section 1810.9. Agreements for retail installment accounts made since have all been subject to the limits set forth in section 1810.2 (originally 1810.4). Those limits have been 1.5 percent of outstanding balances not exceeding $1,000 and 1 percent over that amount except from 1980 through 1987 when statutes of limited duration increased the limits to 1.6 percent on balances not exceeding $3000. However, at all times while the increased rates were effective a statute restoring the lower rates was enacted which became operative when the increased rates expired. Thus since the Unruh Act became effective in 1960 the parties have made agreements for retail installment accounts with the lower 1.5 percent rate limit in mind and the expectation that it would apply when the temporary 1.6 rate maximum expired.

We have pointed out that the retail installment accounts are created by agreements which are far different from the installment sale contract in that such agreements are continuing with terms which are subject to change. We believe the courts would interpret such flexible agreements to apply the finance limits of the law to the entire balance in such account on the date such law becomes operative by incorporating such law into the agreement as one of its implied terms.

Our analysis has addressed the constitutionality of applying the lower 1.5 percent rate limit to purchases made before the lower rate became operative. We demonstrated how such an application did not impair the obligation of contracts or deprive persons of vested rights. Even if such an application did impair existing contracts or deprive persons of vested rights we have cited cases from our highest courts holding that the Legislature has the power to apply the lower limits to existing agreements.

We conclude that the reduction in the maximum finance charge which may be applied to outstanding balances on retail installment accounts under Civil Code section 1810.2 which will occur on January 1, 1988 does apply to those parts of such outstanding balances which were incurred for purchases made prior to January 1, 1988.

\* \* \* \* \*

APPENDIX

Section 1802.7 defines retail installment account as follows:

"'Retail installment account' or 'installment account' or 'revolving account' means an account established by an agreement entered into in this state, pursuant to which the buyer promises to pay, in installments, to a retail seller, his outstanding balance incurred in retail installment sales, whether or not a security interest in the goods sold is retained by the seller, and which provides for a finance charge which is expressed as a percent of the periodic balances to accrue thereafter providing such charge is not capitalized or stated as a dollar amount in such agreement."

Section 1810.1 provides:

"Notwithstanding any other provisions of this article to the contrary, before the first transaction is made on any retail installment account, the seller shall disclose to the buyer in a single written statement, which the buyer may retain, in terminology consistent with the requirements of Section 1810.3, each of the following items, to the extent applicable:

"(a) The conditions under which a finance charge may be imposed, including an explanation of the time period, if any, within which any credit extended may be paid without incurring a finance charge.

"(b) The method of determining the balance upon which a finance charge may be imposed.

"(c) The method of determining the amount of the finance charge, including the method of determining any minimum, charge which may be imposed as a finance charge.

"(d) Where one or more periodic rates may be used to compute the finance charge, each such rate, the range of balances to which it is applicable, and the corresponding annual percentage rate determined by multiplying the periodic rate by the number of periods in a year.

"(e) The conditions under which any other charges may be imposed, and the method by which they will be determined.

"(f) The conditions under which the creditor may retain or acquire any security interest in any property to secure the payment of any credit extended on the account, and a description or identification of the type of interest or interests which may be so retained, or acquired.

"(g)  The minimum periodic payment required.

"In addition to the penalties provided under Article 12.2 (commencing with Section 1812.6) of this chapter, until the seller delivers the written statement required by this section, the buyer shall be obligated to pay only the cash price of the goods or services."

The two versions of section 1810.2 as amended by sections 3 and 4 of Chapter 227, Statutes of 1985, read as follows:

[SEC. 3] "1810.2.  Subject to the other provisions of this article, the seller or holder of a retail installment account may charge, receive and collect the finance charge authorized by this chapter.  The finance charge shall not exceed the following rates computed on the outstanding balances from month to month:

(a) On so much of the outstanding balance as does not exceed three thousand dollars ($3,000), 1.6 percent.

(b) If the outstanding balance is more than three thousand dollars ($3,000), 1 percent on the excess over three thousand dollars ($3,000) of the outstanding balance.

(c) If the finance charge so computed is less than one dollar ($1) for any month, one dollar ($1).

(d) The finance charge may be computed on a schedule of fixed amounts if as so computed it is applied to all amounts of outstanding balances equal to the fixed amounts minus a differential of not more than five dollars ($5), provided it is also applied to all amounts of outstanding balances equal to the fixed amount plus at least the same differential.

"This section shall remain in effect only until January 1, 1988, and as of that date is repealed."

[SEC. 4] "1810.2.  Subject to the other provisions of this article, the seller or holder of a retail installment account may charge, receive and collect the finance charge authorized by this chapter.  The finance charge shall not exceed the following rates computed on the outstanding balances from month to month.

(a) On so much of the outstanding balance as does not exceed one thousand dollars ($1,000), 1 1/2 percent.

(b) If the outstanding balance is more than one thousand dollars ($1,000), 1 percent on the excess over one thousand dollars ($1,000) of the outstanding balance.

(c) If the finance charge so computed is less than one dollar ($1) for any month, one dollar ($1).

(d) The finance charge may be computed on a schedule of fixed amounts if as so computed it is applied to all amounts of outstanding balances equal to the fixed amounts minus a differential of not more than five dollars ($5), provided that it is also applied to all amounts of outstanding balances equal to the fixed amount plus at least the same differential.

"This section shall become operative on January 1, 1988."

Section 1810.3 provides:

"(a) Except in the case of an account which the seller deems to be uncollectible or with respect to which delinquency collection procedures have been instituted, the seller of any retail installment account shall mail or deliver to the buyer for each billing cycle at the end of which there is an outstanding debit balance in excess of one dollar ($1) in that account or with respect to which a finance charge is imposed, a statement or statements which the buyer may retain, setting forth in accordance with subdivision (c) each of the following items to the extent applicable:

"(1) The outstanding balanced in the account at the beginning of the billing cycle, using the term 'previous balance.'

"(2) The amount and date of each extension of credit or the date the extension of credit is debited to the account during the billing cycle and, unless previously furnished, a brief identification of any goods or services purchased or other extension of credit.

"(3) The total amounts credited to the account during the billing cycle for payments, using the term ~payment,' and for other credits, including returns, rebates of finance charges, and adjustments, using the term 'credits,' and unless previously furnished, a brief identification of each of the items included in the other credits.

"(4) The amount of any finance charge, using the term 'finance charge,' debited to the account during the billing cycle, itemized and identified to show the amounts, if any, due to the application of periodic rates and the amount of any other charge included in the finance charge, such as a minimum charge, using appropriate descriptive terminology.

"(5) Each periodic rate, using the term 'periodic rate' (or 'rates'), that may be used to compute the finance charge (whether or not applied during the billing cycle), and the range of balances to which it is applicable.

"(6) The balance on which the finance charge was computed, and a statement of how that balance was determined. If any balance is determined without first deducting all credits during the billing cycle, that fact and the amount of such credits shall also be disclosed.

"(7) The closing date of the billing cycle and the outstanding balance in the account on that date, using the term 'new balance,' accompanied by the statement of the date by which, or the period, if any, within which, payment must be made to avoid additional finance charges.

"(b) The seller shall mail or deliver the statements required by subdivision (a) at least 14 days prior to any date or the end of any time period required to be disclosed under paragraph (7) of subdivision (a) in order for the consumer to avoid an additional finance or other charge. A seller that fails to meet this requirement shall not collect any finance or other charges imposed as a result of such failure.

"(c) The disclosures required by subdivision (a) shall be made on the face of the periodic statement, on its reverse side, or on the periodic statement supplemented by separate statement forms provided they are enclosed together and delivered to the customer at the same time, and further provided that:

"(1) The disclosures required by paragraph (1) of subdivision (a) shall appear on the face of the periodic statement. If the amounts and dates of the charges and credits required to be disclosed under paragraphs (2) and (3) of subdivision (a) are not itemized on the face or reverse side of the periodic statement, they shall be disclosed on a separate statement or separate slips which shall accompany the periodic statement and identify each charge and credit and show the date and amount thereof. Identification of goods or services purchased may be made on an accompanying slip or by symbol relating to an identification list printed on the statement. If the disclosures required under paragraph (4) of subdivision (a) are not itemized on the face or reverse side of the periodic statement, they shall be disclosed on a separate statement which shall accompany the periodic statement.

"(2) The disclosures required by paragraph (5) of subdivision (a) and a reference to the amounts required to be disclosed under paragraphs (4) and (6) of subdivision (a), if not disclosed together on the face or the reverse side of the periodic statement, shall appear together on the face of a single supplemental statement which shall accompany the periodic statement.

"(3) The face of the periodic statement shall contain one of the following notices, as applicable: 'NOTICE; See reverse side for important information' or 'NOTICE: See accompanying statement(s) for important information' or 'NOTICE: See reverse side and accompanying statement(s) for important information'; and

"(4)  The disclosures shall not be separated so as to confuse or mislead the customer or obscure or detract attention from the information required to be disclosed.

"(d)  If any change is to be made in terms of a retail installment account previously disclosed to the buyer, the seller shall mail or deliver to the buyer written disclosure of such proposed change not less than 30 days prior to the effective date of such change or 30 days prior to the beginning of the billing cycle within which such change will become effective, whichever is the earlier date."

[Subdivisions (e), (f) and (g) relate to outstanding credit balances and their disposition.]

Section 1810.9 provides:

"Nothing in this article shall be construed to affect the validity of any agreement or contractual relationship entered into prior to January 1, 1960, except that any rate in excess of that allowed by this article shall be reduced to the permissible rate on or before January 1, 1960."